# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RECEIVED
BY MAIL

NOV 16 2022

CLERK, U.S. DISTRICT COURT,
ST. PAUL, MN

**Marc Amouri Bakambia, Plaintiff**

  V.

**Stephen Craane, M.D.**; Minn. Governor Tim Walz
Luke DeHaan, Physical Therapist; Louis Shicker, M.D.;
 Carol Lu, M.D.; Jay Julius Bauder, M.D.; Genet
Ghebre, N.P.; Surgeon Michael Koeplin; Kevin Jonassen, Minn.
Assist. Attorney General; Paul P. Schnell, Commissioner
of Corrections; Michelle L. Smith, D.O.C. Deputy Comm.;
Nanette M. Larson; Guy Bosch, Warden at MCF-Stillwater;
Victor Wanchena, Ass. Warden of Admin. at MCF-STW
Marisa Williams, Ass. Warden of Admin. at MCF-STW;
James Amsterdam, D.O.C. M.D.; Tina Sneen, Ass.Dir.
Of Nursing; Kathryn Reid, Dir. Of Clinical Operations.;
Lynn Noll, R.N.; Monica Arons, R.N.; Tammy Lisowy,
Therapist; Amber Swanson, R.N.; John DeMay, R.N.;
Sara Hard, R.N.; Lori Lewis, R.N.; Rick Raven, Mail
Room Lieutenant at MCF-Stillwater; Leigh McCoy, Mail
Room staff; Nikki Candor, R.N.; Cheryl Cole, RN; Dan Moe,
Program Director; Steve Renstrom, Case Worker; Susan
Norton, MCF-Stillwater Paralegal; Margaret Zadra, Ombudsperson
for Corrections; Christian Dobratz, Ass. Ombuds for Corrections;
 **Defendants**, in their individual and official capacities.

**Case No.:** 22-cv-2922 PJS/ECW
**District Judge:**
**Magistrate Judge:**


JURY TRIAL DEMANDED
**YES**


## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER
### 42 U.S.C. § 1983 & 42 U.S.C.S §§ 121-2-1221

## I. PREVIOUS LAWSUITS

**A.** Bakambia v. Schnell, et al Court File No.: 20-CV-1433-PAM/TNL, pending appeal &

  Bakambia v. Schnell, et al Court File No.: 20-CV-1434-NEB/DTS, a case since closed, with

summary judgment granted to the Defendants dismissed with prejudice.

### INTRODUCTION

Pro se Plaintiff, **Marc Amouri Bakambia,** 970 Pickett Street North (MCF-Stillwater) Bayport,

MN 55003. This is a Civil Rights Action filed by Marc Amouri Bakambia, a state prisoner, for

1

SCANNED
NOV 16 2022
U.S. DISTRICT COURT ST. PAUL

damages and injunctive relief under 42 U.S.C. § 1983, alleging that defendants used excessive physical force/assault/battery in violation of Eighth and Fourteenth Amendments banned against cruel and unusual punishment; therefore, being deliberately indifferent to his serious medical needs. This was in addition to the discrimination of his ADA condition and the international law by refusing to contact the Plaintiff's country of origin, the Democratic Republic of the Congo, in order to inform them of his confinement and his serious medical condition. Defendants went to the extent of producing to Plaintiff a Consular-Notification Form filled out in faded pencil, hand written (without fax transmission information), claiming that the sheet was faxed but refused to provide to Plaintiff his embassy's fax number used to fax that sheet. In the previous lawsuit, D.O.C Defendants along with their counsel defamed Plaintiff in claiming he had UNCLEAN HANDS in their response to the original and amended complaint and kept it on the public record from November 16, 2020 to present day. Defendants have also repeatedly violated the MGDPA, and interfered with the series of evidences of their culpabilities, therefore aiding and abetting each other. Finally, Plaintiff was repeatedly subjected to retaliation and invasion of his rights, in violation of the First Amendment for enforcing his Constitutional rights in this Court on his previous lawsuits.

## II. EXHAUSTION OF ADMINISTRATIVE GRIEVANCES:

Plaintiff has exhausted his administrative remedies with respect to all claims and all defendants. Facility grievances are attached hereto with accompanied AFFIDAVIT detailing the struggles he has suffered, without any proper remedies being made available to him. Defendants denied him proper due process available and well-deserved administrative remedies at all levels.

### III.  PARTIES

**1.  Mr. Marc Amouri Bakambia,** listed as Plaintiff herein, is currently a prisoner at the

Minnesota Correctional Facility - Stillwater (MCF-STW) located in Washington County, in the

State of Minnesota. Mr. Bakambia has been in the custody of the **Governor** appointed **Mr. Paul**

**P. Schnell, Commissioner of Corrections**, and **Michelle L. Smith, Deputy Commissioner and**

**Nanette M. Larson, Director of the Health Services Unit,** in the State of Minnesota since

December 2015. He has been at MCF-STW, which is and has been under the control and

supervision of Warden Guy Bosch or his predecessor, at all times relevant to this lawsuit.

**2.  Defendant Stephen J. Craane, M.D.** is at all times relevant to this lawsuit, licensed to

practice medicine in the State of Minnesota and is an agent/employee of Centurion (owned by

Centene Corporation from Missouri), contracted with the Minnesota Department of Corrections

(MN D.O.C.) to provide medical services to prisoners. Prior to this, Defendant Stephen Craane

was licensed to practice medicine in the State of Minnesota, and was an agent/employee of

Correctional Medical Services, Inc. (CMS), a foreign corporation registered with the Minnesota

Secretary of State, doing business in Minnesota by providing doctors and other medical

personnel to the Minnesota Department of Corrections, as described in *Stanley Dwayne RILEY*

*V. Joan Fabian, second Amended Complaint No. 82-CV-10-1377.*

**3.  Defendant Luke DeHaan,** is at all times relevant to this lawsuit, licensed to practice physical

therapy in the State of Minnesota, and is an agent/employee of Centurion (owned by Centene

Corporation from Missouri), contracted with the Minnesota Department of Corrections (MN

D.O.C.) to provide services to prisoners.

**4.  Defendants Louis Shicker, M.D.; Carol LU, M.D.; Jay Julius Bauder, M.D.; and Genet**

**Ghebre, N.P.** were at all times relevant to this lawsuit, licensed to practice medicine in the State

of Minnesota, and is an agent/employee of Centurion (owned by Centene Corporation from Missouri) contracted with the Minnesota Department of Corrections (MN D.O.C) to provide medical services to prisoners.

5. **Defendant Michael Koeplin, M.D.,** is at all times relevant to this lawsuit, licensed to practice medicine in the State of Minnesota, and is a member of the Minnesota Surgical Association, contracted by the Minnesota Department of Corrections (MN D.O.C.) to provide such services to prisoners.

6. **Defendant Victor Wanchena,** was at all times relevant to this lawsuit, once the Associate Warden of Administration at MCF-Stillwater, and **Defendant Marisa Williams,** is at all times also relevant to this lawsuit, as the interim Associate Warden of Administration at MCF-Stillwater, replacing Defendant Wanchena, with both having responsibilities to carry out the department and outside agencies policies.

7. **Defendant James Amsterdam,** is at all times relevant to this lawsuit, the Medical Director employee of the Minnesota Department of Corrections, in charge of ALL Minnesota D.O.C. Health Services, and licensed by the state of Minnesota to practice medicine and to provide medical services to prisoners.

8. **Defendant Tina Sneen, Kathryn Reid, Amber Swanson, John De May, Sara Hard, Lori Lewis, and Cheryl Cole** are nurses, and **Defendant Tammy Lisowy,** Mental Health Therapist, licensed by the State of Minnesota and employees of the Department of Corrections, State of Minnesota.

9. **Defendant Nikki Candor,** is a nurse and medical record staff member, licensed by the State of Minnesota and employee of Department of Corrections, State of Minnesota.

10. **Defendant Rick Raven,** is a Mail Room Lieutenant and **Defendant Leigh McCoy** is a Mail Room security staff and are employees of the Department of Corrections Stillwater, State of Minnesota.

11. **Defendant Dan Moe,** was the Case Workers' Supervisor, and is an employee of the Department of Corrections, State of Minnesota.

12. **Defendant Steve Renstrom,** is the Plaintiff's Case Worker and employee of the Department of Correction, State of Minnesota.

13. **Defendant Susan Norton,** is at all times relevant to this lawsuit, the MCF-Stillwater paralegal, also assuming many functions including, but not limited to, ADA member and Facility Litigation Coordinator.

14. **Defendant Margaret Zadra** was at all times relevant to lawsuit, the Interim Ombudsperson for Corrections since January 2022, currently in September 2022 she was appointed by Defendant the Governor Tim Walz, to serve as the Ombudsperson for corrections; and Defendant Christian Dobratz is at all time relevant to this action the Assistant Ombuds for Correctios, and all were charged with responsibilities to serve as a neutral Agents to investigate Complaints of Inmates and employees of DOC arising from abuse and other, racial Bias and other Conditions of confinement and to make policies recommendations to the Commissioner of Corrections.

15. All Defendants listed above at all relevant times were acting under the color of state and federal law and are being sued in their individual and official capacities.

## IV. JURISDICTION

**16**. Jurisdiction of this Court is invoked over causes of action, pursuant to Minnesota Statute

Section 541.07, and due to the acts underlying these causes of action having occurred in

Minnesota. Defendants Paul Schnell, Commissioner of Corrections, and Guy Bosch, Warden of

MCF-Stillwater, are entrusted to provide reasonable accommodations and conditions as well as

quality health care for all offenders under the custody of the Department of Corrections in the

state of Minnesota.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 in that this is a civil

action arising under the Constitution of the United States.

Jurisdiction of this Court is invoked pursuant to 28 U.C.S. §1343(a)(3) in that this action

seeks to redress the deprivation, under color of state law, of rights secured by Acts of Congress

providing for equal rights of persons within the jurisdiction of the United States.

Plaintiff also invokes this Court's jurisdiction seeking declaratory judgment pursuant to 28

U.S.C. § 2201.

Jurisdiction of this Court is invoked on supplemental jurisdiction over Plaintiff's State Law

Claims pursuant to 28 U.S.C. § 1367. This case involves several State Law claims as detailed in

section V (Facts of the case), the MGDPA; ADA pursuant to 42 USCS §§ 12102-12213.

## V. FACTS

**17**. On November 06, 2019, Plaintiff lost consciousness, fell and hit his head and neck on the 2nd

Tier in his living Unit B-East at MCF-Stillwater. Soon after, Plaintiff filed a complaint that he

was given a neuroleptic drug by a D.O.C. defendant named in the case *Bakambia v. Schnell, et al*

*No.: 20-CV-1434-NEB/DTS*. Plaintiff was taken to the emergency room (ER) approximately two

weeks from the alleged administration of that medication. In that case, defendants denied these allegations and claimed that, "Any injuries plaintiff suffered from the fall was his fault" and that they were not responsible, as Plaintiff chose to discontinue his prescribed medications (Topamax and Naproxen) that were prescribed for his Traumatic Brain Injury (TBI). Yet defendants and their predecessors were not discharged from addressing any forthcoming complaints and foreseeable danger to Plaintiff's serious medical needs resulting from the fall and subsequent health problems.

**18.** Ever since, Plaintiff has repeatedly notified Health Services at MFC-Stillwater of his neck, chronic pain, and aggravating headaches he had been experiencing. On January 10, 2020, Plaintiff lost consciousness again in his cell and fell and hit his head and neck. This time, he was placed on medical isolation in his cell for four days. Again, on February 22, 2020, he lost consciousness at the chapel during his meditation session, fell and hit his head and neck. On January 16, 2021, Plaintiff was sent to the emergency room around 01:00 a.m. for chest, neck/throat pain and throbbing headaches. The ER M.D., Matthew T. Bogan, diagnosed Plaintiff with headache syndrome, atypical chest pain, and recommended a neurology evaluation for headache control. M.D. Bogan also strongly recommended for Plaintiff to have a follow-up with his primary care provider (PCP) at the prison and for him/her to schedule a neurology evaluation for Plaintiff's headaches control. He had also prescribed LIDOCAINE for chronic pain in on all four quadrants of Plaintiff's stomach.

**19.** At Plaintiff's return to prison, he was placed on quarantine. Defendants James Amsterdam, Dr. Jay Bauder, Kathryn Reid, Monica Arons, and John DeMay all deprived him of his Lidocaine and the follow-up with PCP. The ER notes were signed off by Dr. Jay Bauder, but it was M.D. Amsterdam who prescribed Plaintiff only Tylenol. Plaintiff made several requests for

the Lidocaine and received none. However, Lidocaine is commonly prescribed to other inmates

per the prison doctors' own initiatives, or per the recommendation of inmate treating specialists.

**20.** Mr. Kevin Jonassen was at times herein incompetent and misinformed as defendants'

attorney with a history of defaming his opponents' character. Mr. Jonassen was negligently

hired, trained and supervised by the Minnesota Attorney General, Mr. Keith Ellison. This

independently resulted in injuries and damages to Plaintiff as explained herein.

**21.** Dr. Craane, physical therapist Mr. Luke DeHaan, Dr. Louis Shicker, Dr. Carol Lu, Dr. Jay

Bauder and N.P. Genet Ghebre were at all times herein incompetent and unskilled physicians

who had a history of negligently evaluating, misdiagnosing, deliberate indifferent and

mistreating patients. Dr. Craane, physical therapist Mr. Luke DeHaan, Dr. Louis Shicker, Dr.

Carol Lu, Dr. Jay Bauder and N.P. Genet Ghebre were each negligently hired, trained, and

supervised by Defendants. This independently resulted in injuries and damages to Plaintiff as

explained herein.

**22.** Mr. Paul P. Schnell; Mrs. Margaret Zadra and Mr. Christian Dobratz were at all times herein

incompetent, and unskilled, following being appointed, negligently supervised by Defendant

Governor Tim Walz who created this Ombuds office to be under his Executive Branch and not

Legislative Branch, and without a Board or Advisory community to oversee and guide it. This

independently contributed to indifference to plaintiff's serious medical needs and condition of

confinement .

**23.**  James Amsterdam, Tina Sneen, Kathryn Reid, John DeMay, Amber Swanson, Lynn Noll,

Tammy Lisowy, Monica Arons, Sara Hard, Jolie Genz, Lori Lewis and Cheryl Cole were at all

times following being hired, negligently trained and supervised by Defendants Commission of

Corrections, Nanette M. Larson, Warden and Centurion. This independently resulted in injuries and damages to Plaintiff as explained herein.

24. Victor Wanchena, Marisa Williams, Rick Raven, Leigh McCoy, Dan Moe, Steve Renstrom and Susan Norton were each negligently hired, trained and supervised by Defendants Commission of Corrections, Nanette M. Larson, and Warden Guy Bosch. This independently resulted in injuries and damages to Plaintiff.

25. In June of 2020, Plaintiff filed two civil cases in Minnesota federal court against the D.O.C. along with their counsel, Kevin Jonassen, who refused to investigate Plaintiff's claims. In its place they've filed their answers to the complaints by including a defamatory defense, stating that Plaintiff claims may be barred by "UNCLEAN HANDS." Then through discovery, they resisted in providing evidence of these alleged unclean hands, claiming that Plaintiff was seeking information protected by the attorney-client privilege, the work product doctrine, or both. They further stated that they were unsure (or cannot say at this point) how, or whether they intended to pursue this defense. It was by court order that they responded, "D.O.C. Defendants have not identified through the course of litigation specific facts supporting this defense." Still, even onto the present they've made no effort to remove this defamation of character from the public record.

26. On March 04, 2021, Plaintiff signed up for sick call while experiencing ongoing migraines, nausea, brain fog, soreness and pain in his sinus cavities stemming from cuts at the inside of his nostril. There was additional pain experienced at his chest and left ear, with discomfort to his upper abdomen and stomach. On March 09, 2021, Plaintiff was seen by M.D. Jay Bauder, who deferred from placing a request for a neurological evaluation, as recommended by the ER Specialist M.D. Bogan for headache control. Rather, Dr. Bauder informed Plaintiff that he would

request an MRI of his brain. This was to aid Plaintiff in his request for approval from Dr. Louis

Shicker for a neurological evaluation.

27. Up until May of 2021, Plaintiff sought no follow-up with Dr. Bauder, nor the requested MRI

of his brain, as promised. Nonetheless, he continued to sign up for sick call, though no one

would see him. Finally, on May 04, 2021, he was seen by Dr. Bauder, along with RN Supervisor

John DeMay. This was following an episode of severe chest pain and lightheadedness on May

03, 2021. Dr. Bauder ordered only bloodwork and an EKG, and would ultimately no longer

consult with Plaintiff.

28. Dr. Bauder negligently evaluated and treated Plaintiff without following his own instruction

and requests, as promised. He further refused to document anything resulting from both clinical

visits, stemming from March 09 and May 04, 2021.

29. Plaintiff began requesting clinical notes stemming from appointments with Dr. Bauder,

pursuant to MGDPA. He would later receive a staff response from Mrs. Nikki Candor, claiming

that Dr. Bauder's notes "do not exist".

30. Plaintiff later found through the prison Certified Nurse Practitioner notes, she stated that

Plaintiff's "last visit for migraine headaches was on May 04, 2022, and another one previous to

that, was on March 09, 2021." A matter of due diligence and a seemingly simple review of

records would have sufficed. There was no such effort made on Mrs. Candor's part to fulfill this

request.

31. On September 15, 2021, Plaintiff was seen by Dr. Craane for worsening pain to his occipital

area, causing him considerable pressure and pain to his brain and neck. There was aggravated

pain coming from his throat and noted redness with white discharge coming from Plaintiff's

tonsils. On this visit, Plaintiff also reminded Dr. Craane that the ER doctor had made the

recommendation of a neurological visit on January 16, 2021. Dr. Craane denied seeing any

redness or white discharge coming from Plaintiff's tonsils. Dr. Craane fabricated notes in which

he claimed Plaintiff reported to him that the neurological recommendation was made on

November 06, 2019. When Plaintiff suggested that Dr. Craane to review Dr. Bauder's notes, he

claimed that he couldn't find them.

**32.** Defendant Dr. Craane negligently and maliciously evaluated and treated Plaintiff, without

conducting any proper analysis, diagnoses, or testing. In this carelessness, Dr. Craane merely

noted that Plaintiff simply suffered from headaches. There were limited notes concerning neck

pain, and abdominal pain – more prominent in the upper quadrant. Plaintiff was then prescribed a

trial of Veraparmil at 40 mg (a short acting Calcium Channel Blocker), three times daily.

Subsequently, Plaintiff experienced lightheadedness and blurred vision.

**33.** Defendant Dr. Craane requested only bloodwork to study Plaintiff's neck and abdominal

discomfort. He informed Plaintiff that he would also order an ultrasound for his abdomen.

**34.** When the CBC results were returned with abnormalities reflecting glucose 109H, BUN/Creat

ratio 8.5L, Polys 27.2L, Polys.ABS.Count 1.22L, and Lymph 61.6 H. Defendant Dr. Craane

outright refused to conduct further evaluations based on these test results. There was no follow-

up examination pertaining to the ongoing issues of Plaintiff's neck pain and sore throat. Relating

to the white discharge and redness from Plaintiff's tonsils, no antibiotics were prescribed, Dr.

Craane refused to admit seeing any redness and white discharge from plaintiff's tonsils.

**35.** On October 01, 2021, Plaintiff was seen by Defendant Dr. Craane for sick call. This was to

address the ongoing issues with chronic neck pain, throbbing headaches and abdominal pain.

After reviewing added clinical notes, Defendant Dr. Craane considered recommendations by ER

Dr. Bogan for a neurological evaluation and ultrasound. Plaintiff was diagnosed with persistent

headaches, yet Dr. Craane failed to note ongoing neck issues and fully complete a neurology request form. On the form, Dr. Craane listed all of the failed therapy medications Plaintiff had tried with the exception of Nortriptyline.

**36.** On October 05, 2021, Plaintiff had an ultrasound of his stomach that was read by Dr.Bernard Baier. This revealed a large hernia and possible non-obstructive calculi, two within each kidney. Dr. Baier requested a CT scan which was conducted on November 11, 2021 and it confirmed the hernia. Dr. Craane hadn't done any further evaluation.

**37.** On October 11, 2021, Plaintiff was again seen for sick call by Dr. Craane. Plaintiff noted worsening conditions with nausea, vomiting, lower back pain, and soreness to his throat. Dr. Craane examined Plaintiff to address the white discharge and continued soreness. Dr. Craane denied seeing anything. Plaintiff was informed afterward that there would be a referral for an otolaryngologist (ENT) and to have an MRI for his neck. The MRI was ordered on October 12, 2021, but the ENT consult continued to be delayed.

**38.** On October 21, 2021, Plaintiff was seen by a Centurion provider for sick call regarding the same ongoing issues from October 11. The Centurion provider falsely recorded that she did not talk with Plaintiff about his sore throat complaint that was clearly listed on the sick call request. Within her subjective part she wrote, "I stated that the many organ systems involved with his pain complaints sometimes makes us think that they are stress-related." Plaintiff was then diagnosed with "Multiple pain complaints of unclear etiology."

**39.** On November 03, 2021, Plaintiff was seen yet again by Dr. Craane for abdominal pain, headaches, and sore throat with white discharge from his tonsils. Dr. Craane remained in his chair without conducting any physical examination. Nonetheless, he recorded that Plaintiff's respiration was clear and even.

**40.** On November 15, 2021, Plaintiff would see Dr. Craane again. This was to address worsening conditions including holes to his teeth, possibly from the bacteria and acid from the white discharge coming from Plaintiff's tonsils. Dr. Craane stated that he did not see any evidence of inflammation, redness, or white discharge. Ultimately, nothing was further prescribed despite Plaintiff's continued pain and admitted soreness. This was due to pending offsite evaluation according to Dr. Craane.

**41.** On November 25, 2021, Plaintiff was seen by a nurse at Health Services for sick call. This was to address the same maladies stemming from his November 15th visit. There was the added numbness noted in his arm, associated with Plaintiff's ongoing neck pain. Contrary to Dr. Craane, this nurse documented the redness that was still apparent. Plaintiff was informed that the MRI and neurological appointment were approved and waiting to be scheduled, even though the general surgery for the hernia and the ENT evaluation had yet to be approved.

**42.** On December 02, 2021, Plaintiff was seen by Dr. Craane for three to four minutes during sick call. Plaintiff complained of severe fatigue and lack of sleep. In this brief meeting, Dr. Craane stopped at the door of the examination room with Plaintiff's medical chart in hand. He had done nothing other than suggesting to Plaintiff to wait for his offsite appointments.

**43.** On December 14, 2021, Plaintiff had an MRI of his neck which was read by M.D. Melissa Yang who interpreted the results as: cervical disc degeneration; C3-4 type I discogenic degenerative end plate changes eccentric to the right; C3-4, C4-5, and C5-6 ventral spurring; nonspecific mildly irregular focus of non-enhancement in the right palatine tonsil, could represent phlegmonous change without definite discrete abscess correlated with direct visualization; mildly enlarged left Level 1A and 1B lymph nodes and mildly prominent bilateral

Level 2 lymph nodes and nonspecific, but favored to be reactive; with mildly left maxillary sinus mucosal thickening.

**44.** The MRI report was reviewed and signed off by Dr. Craane on December 14, 2021. In its place on December 17, 2021, Plaintiff was seen by Defendant Dr. Carol Lu for a follow-up of the MRI results. Dr. Lu recklessly and deliberately refused to show Plaintiff the MRI results, claiming that he would not understand the "big medical terms" within the report. Plaintiff was told that his MRI would only show evidence of the tonsillitis, and was then prescribed Augmentin, an antibiotic common for the ailment. He was directed to take this for no less than ten days. Dr. Lu refused to note on the record the injuries of disc degeneration and sinus mucosal thickening. Also, this medication was prescribed despite Dr. Craane's plan that plaintiff should wait for specialist evaluations before prescribing any medications.

**45.** On December 19, 2021, Plaintiff requested a copy of his latest MRI report from Defendant Kathy Reid. He would receive no response. On December 23, 2021, he requested it again from Defendant Nikki Candor, a prison Medical Records staff member. It wasn't until January 10, 2022 that Plaintiff would receive the report. It was here that he learned of his medical provider hiding his injury of disc degeneration and sinus mucosal thickening.

**46.** On January 07, 2022, Plaintiff was taken to Noran Neuro Clinic for what was to be a neurological evaluation. Once at the clinic, the nurse was surprised to see him there, as she noted to the security officer that someone from the prison had cancelled the appointment, claiming there was a facility-wide medical lockdown due to COVID-19. Yet Plaintiff had a COVID test on January 04, 2022, which was a negative result. Plaintiff was exhibiting no such symptoms tied to COVID-19. The security staff was informed by the nurse to reschedule this appointment.

**47.** On February 14, 2022, Plaintiff had an offsite appointment with a neurologist. Rather than assisting Plaintiff with proper treatment and recommendations with the neurologist, Defendants Dr. Craane and Kathy Reid conspired to withhold the MRI report and results of Plaintiff's neck. The neurologist noted on his record from the visit, "He had an MRI of his neck back in December of 2021. Results are not available to me." It remained unclear as to why there was a continued delay for this neurological appointment.

**48.** The neurologist added within his notes that Plaintiff did have tenderness and spasms over the cervical paraspinal and shoulder muscles, as well tenderness at his occipital region bilaterally. Plaintiff was diagnosed with (1) posttraumatic migraine headaches, (2) posttraumatic cervicogenic headaches and (3) occipital neuralgia. A further treatment was recommended with 50mg of Sumatriptan for the onset of acute migraines. For migraine prevention, His first choice of treatment was Aimovig at 70mg, injection subcutaneously monthly. Alternatively, the neurologist recommended Zonisamide at 50mg, to be taken daily, or Depakote ER at 500mg, to also be taken daily. Physical therapy was also recommended, to loosen up his neck and shoulder muscles, which were likely triggering the headaches and to consider possible occipital nerve blocks.

**49.** On February 25, 2022, Plaintiff had an offsite appointment with an otolaryngologist (ENT). Both Defendants Dr. Craane and Kathy Reid conspired again and withheld the copy of Plaintiff's neck MRI report from the ENT specialist. Plaintiff used the opportunity to discuss with the ENT specialist what he knew of the neck MRI results. The ENT noted on his records that he recommended the Plaintiff to, "Follow up again with the neurologist and physical therapist", as they had also recommended. It was suggested that Plaintiff return in six months for a re-check. The ENT also noted that, "He did have an MRI scan, I do not have the report for that, and do not

have the ability to view the images." He also stressed, "He has been previously recommended physical therapy, but doesn't appear to have started that yet."

50. Defendants Dr. Craane and Kathy Reid had conspired again and sent Plaintiff to the ENT, avoiding liability, then claiming that it was "Patient Self-Referral" and not by any prison health care provider.

51. Dr. Craane recklessly and maliciously signed off on the ENT notes and changed the follow-up request. Rather than maintaining the correct suggestion of returning in six months, Dr. Craane placed an arrow around it, and wrote, "Recheck On-Site PRN", as he already knew that he and Kathy Reid were going to deny Plaintiff proper specialists for follow-up evaluations.

52. On February 17, 2022, Plaintiff signed up for sick call, requesting to be seen by a provider to discuss a follow-up with his neurologist. He added complaints of severe pain and discomfort from his neck, spinal cord, and added back pain. A nurse responded that, "Mr. Bakambia, you are on the list to see physical therapy to address the concerns, per your Neurologist."

53. On March 04, 2022, Plaintiff was seen by Dr. Craane. He asked why it was that he was sent to both the neurologist and ENT specialist for evaluations without his neck MRI report. Dr. Craane replied that he had no idea. He then falsely noted on the record that he reviewed the MRI report with Plaintiff, yet he still failed to diagnose Plaintiff cervical disc degeneration, nor maxillary sinus mucosal thickening. He also denied Plaintiff medical treatment the disc degeneration calls for. Dr. Craane only diagnosed Plaintiff with, "(1) History of Leukopenia, currently within reference range, (2) chronic neck and back pain, physical therapy pending, and (3) symptomatic umbilical hernia, surgical repair requested, per 02/11/2022 surgery consult."

54. On March 04, 2022, Plaintiff asked Dr. Craane about the recommendations to follow-up again with the neurologist. This was to address the issues of cervical disc degeneration noted

16

from the ENT's records. Dr. Craane manipulated the ENT's statements and recommendations, claiming that the ENT noted, "Recommend follow-up again with Neurology and physical therapy, as they have recommended." This meant to Dr. Craane that the ENT did not recommend a follow-up with neurology, only physical therapy. See also Dr. Craane's notes from March 24, 2022.

**55.** Plaintiff asked Dr. Craane about the physical therapy. He responded that he already had made an order for physical therapy from February 14, 2022.

**56.** Plaintiff asked Dr. Craane why he did not start him on the primary recommended treatment of Aimovig subcutaneous injections. He was instead prescribed the second alternative medication of Depakote. This was in evident disregard of the side effects which brought on Plaintiff's existing pain at his left jaw and left side of his face. Dr. Craane stated that the Aimovig was the alternative treatment prescribed by the neurologist.

**57.** On March 20, 2022, Plaintiff requested from Defendant Nikki Candor the practitioner's orders from February to March 20, 2022. She responded, "Here is everything requested. There are no other Dr. notes from that timeframe." Yet she did not send any other orders reflecting that Dr. Craane had placed an order for physical therapy on February 14, 2022. On March 21, 2022, Plaintiff again requested the practitioner's orders. Mrs. Candor responded, "I sent you the practitioner's note for 03/04/2022 – that's the only one in that timeframe."

**58.** On March 24, 2022, Plaintiff was seen by Dr. Craane for sick call. He again asked about his physical therapy appointment, and related his response received from Mrs. Candor, claiming that there was no such practitioner's order. Dr. Craane showed Plaintiff a copy of the order he made from February 14, 2022 that only noted "Physical therapy Consult (See 14 Feb. 22 Neurology

Consult). Yet, Dr. Craane outright lied on paragraph 55 when he stated "Chronic neck pain and back pain, physical therapy pending."

59. On March 24, 2022, Plaintiff again mentioned that his MRI report was being withheld from the neurologist and ENT. Dr. Craane noted on the record that Centurion would want to know the outcome of the physical therapy before considering any additional offsite appointments. He added that the otolaryngologist would be contacted to ensure that he received a copy of the patient's MRI report, and to see whether he had any additional recommendations for the patient. Dr. Craane misdiagnosed Plaintiff with: (1) Neck pain with radiculopathy, and (2) report of sinus pain, exam "very benign" per otolaryngology. He then handed Plaintiff general information on cervical spondylosis, printed from a Mayo Clinic website article. This was in response to plaintiff request for his guideline for diagnosis and treatment of his Cervical Disc Degeneration. He added that Plaintiff's cervical disc degeneration is an age-related condition, obviously disregarding incidents that caused these injuries.

60. On March 28, 2022, Plaintiff was seen by Defendant Luke DeHaan for physical therapy. Mr. DeHaan approached Plaintiff unannounced and went to stand behind him. Without advance warning, Mr. DeHaan suddenly dropped the butt of his palms to the crown of Plaintiff's head and applied compressions downward to his neck. This was with considerable force, knowing full well Plaintiff's condition of cervical disc degeneration. He asked Plaintiff to conduct two exercises – first from his ear to his armpit, followed by nose to armpit, at 30 seconds each. He suggested that Plaintiff was to do these three times daily. He vaguely noted that he did only a cervical compression traction that was negative bilaterally, with "compression traction", which left the condition open to a variety of interpretations. It was also noted that Mr. DeHaan had declined to address plaintiff's back pain issues.

**61.** The evident medical recklessness, which was both criminal and malicious, involving the compressions to Plaintiff's head and neck was proven in that this measure was evidently never utilized on any other inmate before or since. Mr. DeHaan was well aware of Plaintiff's existing condition, yet proceeded with these compressions despite that knowledge. If anything, greater care and a preliminary exam were first in order. This only exacerbated Plaintiff's condition, and contributed to additional side effects.

**62.** On April 07, 2022, Plaintiff missed his 07:00am migraine medication due to pain in his neck. On April 09, 2022, he awoke shortly after 04:00am due to pain and discomfort in his neck and left temporal, as well as a persistent migraine headache. On April 11, 2022, he awoke at roughly 03:00am due to pain in his neck and excruciating pain felt directly between his degenerative discs.

**63.** On April 12, 2022, Plaintiff made a request pursuant to MGDPA to Defendant Victor Wanchena. Mr. Wanchena was Associate Warden at MCF-Stillwater as well as the Facility Data Practices Authority at the time. Plaintiff had asked for video surveillance of his physical therapy assessment, showing the compressions performed by Mr. DeHaan. Mr. Wanchena refused to comply, sooner responding that video footage of the physical therapy room did not exist. On April 18, 2022, Plaintiff resubmitted a request to clarify that he was asking for video surveillance of the entire assessment from all camera angles in that area. This would all prove to be in vain. Mr. Wanchena maintained his resistance to comply with the MGDPA guidelines, claiming that no such video recordings exist from the examination room and area of Health Services.

**64.** On April 13, 2022, Plaintiff was seen by Dr. Craane for no more than 10 minutes. Plaintiff reported that Mr. DeHaan had brought forceful compression to his disc degeneration during his physical therapy session. Dr. Craane remained silent, and had suppressed these allegations in that

they were not recorded within his notes. He only listed, "The Physical Therapist did evaluate the patient on 03/28/2022; the patient states that the evaluation the physical therapist performed left him with greater pain in his head and neck."

65. Dr. Craane negligently, recklessly, and falsely noted within his notes on April 13, 2022, "The 30 minutes spent counseling patient…" knowing full well that this visit lasted no more than ten minutes in its entirety.

66. On April 15, 2022, at roughly 05:00am, Plaintiff awoke with excruciating pain in his neck and a strained cough that brought on aggravated stress felt between the two degenerative discs. Plaintiff had security staff contact Health Services seeking emergency attention. He would ultimately be seen by Defendants Dr. Craane and John DeMay. Both denied Plaintiff medical care for his cervical disc degeneration. In its place, they were offering Plaintiff a copy of the DOC policy relating to offender self-pay care, should he elect to seek outside consultation. Dr. Craane noted on the record, "Patient was further offered documentation regarding the Department of Corrections 'second opinion policy'".

67. On April 18, 2022, Plaintiff sent a second request pursuant to MGDPA, asking Associate Warden Wanchena for video surveillance of his physical therapy assessment from March 28, 2022 as well as his brief clinical visit with Dr. Craane from April 13, 2022. This was to show what time had actually elapsed during Plaintiff's appointment with Dr. Craane. The visit took place at Room 10 119, where a camera is visible at the upper left corner as you walk in. Mr. Wanchena resumed his stance from the previous request, maintaining that there is no video surveillance coverage within examination areas. He added within his response that there is no video of examination rooms in Health Services.

**68.** Plaintiff filed a grievance relative to MGDPA, requesting video surveillance of his physical

therapy assessment which was ultimately rejected. He also filed a grievance appeal regarding the

request which was denied, asking for video surveillance from his clinical visit with Dr. Craane

from April 13, 2022 which will show a brief assessment and not 30 minutes as Dr. Craane falsely

recorded. Commissioner Paul Schnell's office had also denied Plaintiff's grievance appeal,

claiming that Plaintiff's grievance was not complete. In the Commissioner's response, it was also

stated that video surveillance is not conducted from inside exam rooms. As an aside, it was

further noted that if there was a need to record, a corrections officer would be present with a

video camera. They added that recording via the regular camera systems (hallways, living units,

etc.) are overridden after 30 days due to limited video storage capacity. They've also added that

Health Services Program Director Mrs. Mayer stated that "Dr. Craane often dictates the amount

of time spent on patient cases-this can include in the chart review, actual in chair appointment

time, and follow up orders writing and dictation."

**69.** Contrary to Defendants Wanchena and Commissioner Schnell's response, on December 07,

2021, Plaintiff requested video surveillance of his Incident Command System (ICS) from

September 09, 2021. Within a Health Services exam room, a nurse can be seen taking Plaintiff's

EKG results from a machine and throwing them in the trash. Defendant Wanchena responded,

"Video footage is considered confidential security data. The retention of that video is also

considered confidential security data."

**70.** Defendant physical therapist Luke DeHaan negligently evaluated Plaintiff again on April 26,

2022. He dismissively disregarded Plaintiff's complaint of worsening pain since he administered

compressions to the head and neck on March 28, 2022. Mr. DeHaan told Plaintiff that they were

"done here" in a very terse and demeaning tone and that there would be no future sessions with

him. Mr. DeHaan then noted on the record that, "The patient reports he found some testing uncomfortable last time." He falsely added that, "Patient appeared to be benefitting much from home exercise program", despite Plaintiff addressing that these exercises were only bringing on added pain. In the end, Mr. DeHaan would urge Plaintiff to discontinue such exercises.

**71.** Defendant Luke DeHaan negligently noted on the record that based upon the information that presents itself today seems to suggest that Plaintiff's headaches are not cervicogenic in nature. This was only an attempt to contradict the neurologist's assessment of evident cervicogenic headaches.

**72.** On April 21, 2022, Plaintiff requested of his case worker, Defendant Steve Renstrom, to contact the Embassy of the Democratic Republic of the Congo, Plaintiff's native country. According to Department of Corrections Policy 203.115, Consular Notification Procedures A-D, prison staff are to inform an inmate's native embassy of their confinement and whenever the inmate is at serious health risk and/or with life-threatening illness or injury. No one within the Embassy was reached regarding Plaintiff's condition. This was despite his ongoing and progressive C3-4 disc degeneration disease and traumatic brain injury. These were two serious ailments and, as documented throughout, his traumatic brain injury and Cervical degenerative disc disease would constitute as "life-threatening". Mr. Renstrom responded that he had spoken to Nurse Supervisor, Defendant Amber Swanson, and she informed him that Plaintiff did not have a life-threatening illness or injury.

**73.** Defendant Renstrom later provided Plaintiff with a supposed "Fax Sheet – Consular Notification" written in what appeared to be faded pencil, not entirely legible. Mr. Renstrom claimed that this was faxed to Plaintiff's embassy, informing them only of his confinement and not of his serious injuries. There was no facsimile transmission information to, in fact, confirm

22

that this notice was ever sent. This information was ultimately requested of Mr. Renstrom, with instruction to include an Embassy fax number that was used to send this sheet. Well onto this date, Plaintiff has yet to receive anything relating to this request.

**74.** The Minnesota DOC Central Office of Defendant Commissioner Paul Schnell later denied Plaintiff's grievance appeal and refused to enter this information within their electronic database. Much like the previous grievances, the Commissioner's response merely stated, "Mr. Renstrom was not required to contact Mr. Bakambia's embassy. We cannot speak to why there is no copy of a fax transmission. We can state that the Central Office faxes are sent via multi-function printer/copiers, which do not print out fax confirmations. Mr. Renstrom may have used such means to send that fax to which you refer." At the bottom of this transmittal two different fax numbers are shown: 202-234-2609 and 202-223-3377.

**75.** On April 28, 2022, Plaintiff was scheduled for a doctor's appointment. At the clinic, a DOC Certified Medical Assistant conducted a pre-operation exam on Plaintiff. She informed Plaintiff that his offsite appointment for the ENT was cancelled. Lacking the scope to discuss all matters with him, she stated that Dr. Craane would later consult with Plaintiff. According to DOC Policy 500.127, Procedure C.6, "Schedule an offender with the practitioner, if the request must be deferred in order to discuss alternative treatment plans." Later on, Dr. Craane evaluated Plaintiff, and informed him that it was his boss, Defendant Louis Shicker, who after reviewing Plaintiff's medical chart, had decided to cancel the appointment with the ENT in favor of a pain specialist. Dr. Craane deliberately lied to Plaintiff, claiming that the appointment with the pain specialist was scheduled, yet couldn't provide the exact date due to security reasons. Unfortunately, Plaintiff never saw any pain specialist, and Dr. Craane intentionally refused to write a medical note to indicate there was an appointment.

**76.** It was also noted that in the encounter with Dr. Craane on April 28, 2022 that Plaintiff complained of pain in his sinuses, and that there were cuts inside his left nostril. Dr. Craane prescribed Mupirocin 2% ointment, with the wrong instructions to follow. The cuts were to Plaintiff's left nostril, but Dr. Craane negligently and recklessly wrote an instruction to apply the salve to his right nostril.

**77.** Dr. Craane continuously manipulated Plaintiff's access to the ENT, and further refused to provide the ENT with his neck MRI report. Dr. Craane had previously noted within his record that he would contact the ENT to ensure that a copy of Plaintiff's MRI report was received. Following this note, Dr. Craane changed his story; noting again that he discussed Plaintiff's conditions with his ENT, who had no additional recommendations, but suggested a follow-up evaluation if the patient's facial pain persisted.

**78.** Contrary to Dr. Craane, Defendant Mrs. Candor, a Medical Records staff member, noted on the record that she told Plaintiff that there is no record in the chart of the ENT doctor saying anything after seeing his MRI report.

**79.** On May 05, 2022, Plaintiff underwent an umbilical hernia surgery performed by Defendant Dr. Michael Koeplin. Following this procedure, he decided that Plaintiff did not need placement under a Transitional Care Unit (TCU). When Plaintiff arrived back to MCF-Stillwater, Defendant Kathy Reid gave the order to security staff to transport Plaintiff to the TCU at MCF-Oak Park Heights. Subsequently, Plaintiff was left at the security center in a sitting position for roughly 45 minutes, with severe pain at his abdomen while awaiting transport to the TCU. This decision by Mrs. Reid was made contrary to the recommendation of surgery staff. This involved Plaintiff taking two oxycodone and an Imetrex for the acute migraines and pain to his surgical site.

**80.** Mrs. Reid failed to respond to Plaintiff's questions as to why he was left at the security center for that span of time. Plaintiff further questioned why that determination was made from MCF-Stillwater. Mrs. Reid responded with only, "Placement is medically determined after surgery. We placed you there for a short time to ensure pain control post-operatively." Yet Mrs. Reid would never include which place she was referring to in the end.

**81.** Plaintiff was sent to the TCU without his keep-on-person (K.O.P.) medications. These would remain at MCF-Stillwater, with five pills of Imetrex remaining on his card. A TCU nurse called Health Services at Stillwater to locate the K.O.P. medications. Defendant Amber Swanson responded that she would see if she could locate them. Later Defendant Sara Hard called back the TCU nurse, claiming that they weren't having any luck getting medications, and weren't sure that Plaintiff had any remaining.

**82.** On May 13, 2022, Plaintiff had a consultation with Dr. Koeplin for his post-operation. Defendants Dr. Craane and Kathy Reid knowingly sent Plaintiff to this consultation without any documentation from the TCU, nor with any summary including the medications he was prescribed during his "recovery". Dr. Koeplin appeared upset over these facts. Mrs. Reid's explanation was, "Notes sent to a follow-up appointment are focused on the surgical needs. If the surgeon wanted additional records, he/she could request."

**83.** As the condition of Plaintiff's disc degeneration continued to worsen since the compressions done by Mr. DeHaan, he would submit requests for sick call. All sick call requests relating to this issue would continue to be cancelled.

**84.** From April to May 2022, Plaintiff forwarded all of his serious medical issues to Defendant Tina Sneen at the Minnesota DOC Central Office, within the Health Services Unit. Specifically, Plaintiff sent each issue on different kites, with distinct envelopes. One issue was permitted to be

addressed per kite, after all. Yet Mrs. Sneen refused to respond. She ultimately combined all of

Plaintiff's kites and wrote that there would be a care conference scheduled to review each issue

Plaintiff presented. This was in place of adhering to Plaintiff's due process rights and interfered

with his efforts in exhausting administrative remedy. Mrs. Sneen's actions were not made until

after Plaintiff had addressed these matters with the DOC Ombudsman on May 17, 2022. Plaintiff

included the reports of compressions done to his neck, on his disc degeneration, and other issues

including retaliation, though the Ombudsman Defendants Dobratz and Zadra would never

investigate these claims.

**85.** On May 04, 2022, Plaintiff requested an ADA services. He also requested an additional MRI

to check on the extent of his worsening condition of his disc degeneration since the

compressions. On June 08, 2022 defendant Mrs. Williams denied the service, stating that Health

Services reports that Plaintiff had an MRI and that an additional one was not supported.

**86.** On May 24, 2022, Plaintiff made an MGDPA request to Defendant Susan Norton, who at the

time was covering Mr. Wanchena's position. Plaintiff requested a preservation of video

surveillance from his clinical visit with Dr. Craane from April 28, 2022. Mrs. Norton responded

on May 26, 2022. She directed Plaintiff to send a kite to Mrs. Williams, who by then had taken

on Mr. Wanchena's previous position on an interim basis. Mrs. Williams instructed Plaintiff to

write a request to OSI for video surveillance. Plaintiff sent his request via certified mail to OSI at

the Minnesota DOC Central Office. Plaintiff has never received any response.

**87.** On June 01, 2022, Plaintiff received a direct order pass to report to the operation room within

MCF-Stillwater. He was escorted by his case worker, Steve Renstrom. Once they had arrived, in

the room sat Dr. Craane, Luke DeHaan, Tina Sneen, Kathy Reid, Amber Swanson, John DeMay,

and Dan Moe (Case Workers Supervisor). All participated in this conference, including Mr.

Renstrom. Amber Swanson was the only one visibly taking notes. This meeting would later be labeled "care conference", and was later changed to "multidisciplinary conference" by Dr. Craane and Mrs. Sneen, and again by defendant Mrs. Larson.

**88.** At this "care conference", Mr. DeHaan stated that he applied approximately "5% of compression" to Plaintiff's degenerative cervical disc.

**89.** Plaintiff asked for an additional MRI report of his neck to see the extent of the damages due to these compressions. Both Mrs. Sneen and Mrs. Reid denied the request, while Dr. Craane and Mr. DeHaan sat in silence. This was despite Mrs Sneen and Mrs. Reid lacking the qualifications to make such determinations.

**90.** Plaintiff asked Defendant Dr. Craane to provide him with published guidelines regarding the diagnosis and treatment for cervical disc degeneration and associative back pain. Mrs. Sneen and Mrs. Reid prevented Dr. Craane from responding, where they each spoke on his behalf. Neither were qualified nor with the medical background to decide on this matter. Mrs. Reid instructed Plaintiff to accept their answer as a "team response".

**91.** Plaintiff related to all present at the "care conference" of his severe abdominal and back pain. He stated that he would again sign up for sick call. Mrs. Sneen and Mrs. Reid assured him that he would be scheduled. However, the stamp for receipt was backdated to May 31, 2022. This was despite Plaintiff placing his request for sick call soon after the conference of June 01, 2022. He would not be seen until June 07, 2022. Dr. Craane finally requested an ultrasound of Plaintiff's stomach.

**92.** The Office of the Legislative Auditor's 2014 Evaluation Report Health Services in State Minnesota Correctional Facilities states that professional standards call for quality improvement committees that are multidisciplinary in nature. This was contrary to who was actually present at

the "care conference" of June 01, 2022. The participants were either nursing staff, physical

therapists, or case workers. Such committees are to include the DOC's Director of Health

Services, Medical Director, Director of Nursing the Regional Medical Director of Health

Services, contractor, a physician from a contracting hospital provider, and a physician that

provides onsite care to offenders at that correctional facility. The "care conference" for Plaintiff

included merely one of these.

93. On June 05 plaintiff sent a brief complaint to Ass. Ombuds for Corrections Mr. Dobratz

informed him of the prejudice care conference held by a blended participation of defendants and

requested to know the name of the Interim Ombudsperson for Corrections he had referred to on

his previous response. Mr. Dobratz refused to provide plaintiff the name of Mrs. Margaret Zadra.

Plaintiff found through another inmate who informed him that he had a conference with Mrs.

Zadra, Ms. Williams and other DOC staff members for their complaint of racial discrimination.

94. By early June 2022, Plaintiff's sister Stephanie Bakambia had become very concerned about

her brother's cervical disc degeneration not being properly treated and being compressed by a

prison physical therapist Each correspondence – be it by email or telephone – was from London,

England. These efforts were made despite the seven-hour time difference and arranging her

schedule to contact prison medical staff. She reached Health Services and spoke with Mrs. Reid,

requesting her brother's medical records. Mrs. Reid asked her for her email so that she could

send them. This was a delay tactic and scheme in that Mrs. Reid would never send these records.

When Plaintiff's sister called back again later that week, another nurse responded, being very

rude to her, she also claimed that Mrs. Reid was not in. Plaintiff's sister is the Power-of-Attorney

on record and had provided a release of information to prison medical staff.

**95.** Plaintiff sent a kite to Mrs. Reid requesting a record of her phone conversation with his sister. Mrs. Reid replied that phone conversations are not recorded on the medical record. Plaintiff sent another kite, asking her to review a nurse's records from February of 2020, where such a phone call was recorded. Ultimately, Mrs. Reid never responded.

**96.** Upon information and belief, another inmate also did inform plaintiff that the phone conversation between his mother and a nurse was well recorded on his medical chart. He may well which to make a declaration for plaintiff along with supporting documents.

**97.** Around June 07 or June 08, 2022, Plaintiff again received another response from Defendant Mrs. Sneen. Her response was dated June 03, 2022. There were two sets of kites with two different issues which Plaintiff had forwarded to her from the DOC Central Office, on May 26, 2022. Mrs. Sneen refused to stamp these two kites addressed to her. In her letter, she falsely claimed that she received only one kite and that she received it on May 23, 2022. This was despite the concrete evidence of the receipt showing this was mailed to her on May 27, 2022. Mrs. Sneen stamped the envelope May 31, 2022, just as the date reflected as received at the DOC Central Office Health Services Unit. In her response, Mrs. Sneen directed Plaintiff to review the summary of the "Care Conference", yet they continued to deprive him of that "summary report".

**98.** It was until June 17, 2022 that Plaintiff had received a copy of the summary report of the June 1st, 2022 "care conference". The report was grossly inaccurate in that there was no name of a staff member who drafted the report, nor the date it was written. More critical is that the report listed a "staff introduction", though they did not include any names of staff members, or the account of those who had spoken on other staff members' behalf. The report intentionally and maliciously recorded data inaccurately.

**99.** On June 14, 2022, Plaintiff had an offsite appointment for the occipital nerve block per his neurologist. In the Noran Neuro Clinic he reported to the specialist that his neck was compressed by the physical therapist Mr. DeHaan, which had worsened his condition. The specialist refused to inject anything near the degenerative discs. She noted on the record, "Patient expressed concern regarding neck pain that has been exacerbated by physical therapist. This is to be further discussed with Dr. Todd in follow-up". Then she made a follow-up with the neurologist, Dr. Todd, for headache/neck pain and an imaging referring to pplaintiff's MRI report.

**100.** On June 14, 2022, Plaintiff returned from his appointment and met with Dr. Craane who was by then well aware of the request for a follow-up appointment. Dr. Craane only asked if Plaintiff wanted a culture test. Dr. Craane falsely noted on the record that when he left the room to arrange collection of the throat culture, Plaintiff walked out the clinic. Dr. Craane misdiagnoses of Plaintiff's character continued for reasons only known to him.

**101.** On June 15, 2022, Plaintiff had an ultrasound ordered by Dr. Craane, yet there was no follow-up or discussion to go over these results.

**104.** On June 20, 2022 Plaintiff sent a kite to Mr. John DeMay requesting names of staff members who participated in the "care conference", the name of the staff member who wrote the report, including the date and time the report was written, and had asked why Mr. DeHaan's statement that he applied "5% compression" to Plaintiff's degenerative cervical disc was not mentioned in the report. Defendant Kathryn Reid responded in place of Mr. DeMay, claiming that, "Names of participants should have been included in the document." Plaintiff attached a copy of the summary for the care conference to another kite to Mrs. Reid for her to see if there are any names of the participants. He also referred her to a facility memo that directed him to

address this issue to Health Services. Mrs. Reid then changed her story in stating, "I see no

documentation nor do I recall discussion of me being your primary point of contact."


**103.** On July 01, 2022, Plaintiff was seen by Dr. Craane for sick call related to his severe neck

pain and pinching nerves and abdominal pain. Dr. Craane appeared confused as he told Plaintiff

that his appointment with the neurologist is set for mid-July 2022 via Zoom/Telemedicine.

Plaintiff's stance was that this was not true. Dr. Craane left the room to verify with Mrs. Candor,

and soon after returning, changed his story, stating that the appointment would be held offsite

(again) at some point in mid-July. Dr. Craane attempted to conclude with Plaintiff without

sharing the latest ultrasound results. Only after Plaintiff reminded him was when Dr. Craane read

some of the data from the computer screen. He informed Plaintiff there was yet another hernia -

in the same location as the previous procedure done on May 05, 2022. In addition, it was found

that Plaintiff had a kidney stone located in his right kidney. Much the same would have shown as

from his ultrasound results reviewed on October 05, 2021.

**104.** Dr. Craane did not sign off Plaintiff's ultrasound report prior to being filed in Plaintiff's

medical record, as required by DOC policy 500.045, Procedure M.

**105.** On July 12, 2022, Plaintiff was awoken with an acute migraine, where even the slightest

noise would bring on pain. At 07:00 a.m. he was called for an appointment that he believed was

for a consultation with the neurologist per his discussion with Dr. Craane on July 1, 2022.

Plaintiff had no other reason to suggest it were another appointment. Once arriving at the Noran

Neuro Clinic, the specialist informed him that they were proposing a second injection by the

same specialist that conducted the occipital nerve block on June 14, 2022. Plaintiff refused this

injection since the first was to little effect but for one day and told this specialist of the lie Dr.

Craane made of this appointment being for the neurology follow-up.

**106.** Once returned to the prison, the officer in transport accompanied Plaintiff to Health

Services. Dr. Craane was present and Plaintiff asked him about this injection appointment, and if

it were ever discussed beforehand. Dr. Craane completely avoided this and referred to the letter

from the specialist, listing a follow-up appointment with the neurologist. He then stated that he

already made a request. Here Plaintiff stressed that Dr. Craane previously claimed that he would

be seeing a neurologist "in mid-July." Dr. Craane walked away without saying anything more.

**107.** It was only on the evening of July 12, 2022 that defendant Nikki Candor sent Plaintiff his

medical record request initially made on June 28, 2022, pursuant to MGDPA and Minn. Stat.

§ 144.215. This request included his offsite record from June 14, 2022, his ultrasound report

from June 15, 2022, Dr. Craane's notes from April 28, 2022, he fabricated notes of pre-op and

other relevant records available from these dates. Plaintiff understood that there was an order

made by the specialist for a repeat occipital nerve block in 4 weeks. He was never informed of

this, and it proved only through his own observation that he had seen there was also a

confirmation of hernia at the previous operative site. Notes indicated that the spleen was mildly

heterogeneous and normal in size, the liver was heterogeneous with peri-portal cuffing and was

upper limit of normal size; there was also a kidney stone in the right kidney.

**108.** Dr. Craane's notes from July 21, 2022 reflect that he recklessly and negligently listed that

Plaintiff declined evaluation of the oral cavity, again continued to misdiagnose Plaintiff's

condition, knowing he never asked him to open his mouth for such an examination. This proved

dangerous to Plaintiff's health and safety, as Dr. Craane was well aware of Plaintiff's dental

condition, the loose teeth with holes, and the potential this could have in the use of an anesthesia

during his hernia procedure. Yet Dr. Craane only wrote, "Moderate tenderness along the anterior aspect of patient's left chin."

**109.** Dr. Craane noted that he advised Plaintiff that in order to avoid interfering with his Neurologist's work-up of his issues, he would wish to first discuss patient's current symptoms (with the neurologist) before starting any new medication.

**110.** On July 23, 2022, Dr. Craane changed Plaintiff's medication from Depakote 500 mg at twice daily to Zonegran 25 mg K.O.P. This was contrary to the recommended dose of Zonegran 50 mg/daily, per the neurologist's notes of 02/14/2022. This confused Plaintiff and he believed that seeing the record from the neurologist would make it more clear, but no one sent him this data. Plaintiff declined this medication until he could verify confirmation from the neurologist. Subsequently, Plaintiff was forced by Dr. Craane to take it or sign a refusal of treatment.

**111.** On July 26, 2022, Plaintiff signed up for sick call for severe pain in his neck, with a burning sensation on his left side, a persistent migraine, pain and numbness on his toes and continued stomach pain. He was denied sick call. Defendant Sara Hard responded, "M.D. Craane reviewed and advised to continue Zonegran as his plan of care."

**112.** On July 29, 2022, Plaintiff went to pill window around 07:00 am and retrieved the Zonegran card, returned to his cell, and then went to his art class. That day he would see no one else from the Health Services.

**113.** Plaintiff signed up for sick call again on July 28 and July 29, 2022. He was never seen.

**114.** On July 29, 2022, Plaintiff attached a sick call slip to a kite addressed to Mrs. Reid. He requested to be seen by a provider as soon as possible to discuss issues of the Zonegran. Mrs. Reid falsely responded that, "Mr. Bakambia was seen by Dr. Craane on July 29, 2022."

115. Dr. Craane and Mrs. Reid then conspired in that Dr. Craane created a record of July 29, 2022 which had shown a narrative explaining his phone conversation with Plaintiff's neurologist that supposedly had taken place on July 22, 2022. This was in place of describing the nature of the clinical visit with Plaintiff on July 29, 2022, as Mrs. Reid falsely claimed. Also, within the notes Dr. Craane wrote, "Would be willing to recheck patient liver function tests if he desires."

116. On August 03, 2022, Plaintiff signed up for sick call again and was seen by Dr. Craane, but not until August 11, 2022. Plaintiff stressed that trying the Aimovig injections monthly was the primary recommended treatment per the neurologist. This equated to Dr. Craane interfering with and depriving Plaintiff of proper treatment. Upon agreement, Plaintiff returned the full card of Zonegran to Dr. Craane under the pretense of taking none further until he would see the neurologist to discuss a treatment plan.

117.  Plaintiff asked Dr. Craane to further test his liver. He also had shown his second toe of his left foot to Dr. Craane by removing his shoe and sock. There was a round dark skin patch at his toe and he noted that it was irritating and itchy. Dr. Craane refused to request any additional tests for Plaintiff's liver, but added that he would order medication for this dark skin patch. Unfortunately, Dr. Craane never ordered any medication, nor did he even mention this condition from his notes. On the record, Dr. Craane noted that he offered to repeat liver function studies but Plaintiff was "noncommittal" regarding this offer.

118. Dr. Craane negligently misdiagnosed Plaintiff, claiming that, "He has medically noncompliant behaviors, patient is speaking in an unusually stuttering manner, and seems to take several moments to gather his thoughts before speaking."

119. On August 15, 2022, Plaintiff had an off-site appointment with Defendant surgeon Michael Koeplin for his confirmed recurrent hernia. At the clinic, Dr. Koeplin refused to accept or concur

34

with the ultrasound results that confirmed another hernia a month later from the previous operative site. This procedure was done by Dr. Koeplin on May 05, 2022. The June 15, 2022 ultrasound was read by Dr. Bernard Baier. Dr. Koeplin refused to accept this reading, where he sooner requested a more painful and aggressive procedure of laparoscopy for "possible hernia", wantonness, and recklessly and objectively subjected Plaintiff to unnecessary cruel and unusual punishment.

**120.**  On August 21, 2022, Plaintiff requested video surveillance of his visit with Dr. Craane from August 11, 2022 pursuant to MGDPA from Mrs. Marisa Williams. He explained this visit had occurred inside the exam room No. 10 119. This room has a visible camera at the upper left corner as you enter. Mrs. Williams attempted to play with this request. Rather than responding directly to the kite, she attached a yellow Post-it note that listed, "Please work w/Captain Connors. She can assist with the video coverage. Please see email from OSI Swanson. He said he sent you an email."

**121.** Plaintiff began to feel his life and health were in jeopardy under the continued care of Dr. Craan. On August 21, 2022, he sent a kite to Mrs. Reid requesting to be taken off from under the care of a lying doctor (Stephen Craane). Plaintiff asked to be seen in future by any provider other than Dr. Craane. Mrs. Reid responded that Plaintiff may refuse any health care but she strongly encourages him to participate.

**122.** Plaintiff sent another kite to Mrs. Reid on August 24, 2022, reminding her that he has been participating, but he didn't want to be seen again by a lying doctor who provided him nothing but continued runaround and game playing. Mrs. Reid in turn responded that, "STW has one M.D. onsite, STW has one N.P. onsite to provide health care." Ultimately, she honored Plaintiff's

request, and ever since Plaintiff has been seen by a different provider, Defendant Genet Ghebre, N.P.

**123**. On August 23, 2022, Plaintiff was finally scheduled for a follow-up appointment with the neurologist. However, this was sixty-nine days later from a request that was made as priority. First, Plaintiff was taken out his living unit and brought to the Security Center and kept there for about one hour. As a result, he was late to his appointment and this shortened his clinical time with the neurologist. Also, rather than helping Plaintiff, Defendants Dr. Craane, PT Luke DeHaan, Kathryn Reid, John DeMay, Amber Swanson, and Nikki Candor all conspired to withhold again the neck MRI report to be relayed to the neurologist, which was clearly requested twice on June 14 and July 12, 2022. This resulted in Plaintiff's cervical disc degenerative disease not being addressed by the neurologist. Plaintiff reported to the neurologist the compressions Mr. DeHaan had brought to his neck. The neurologist told him that he needed the MRI report of his brain and neck before he could make any recommendations. The neurologist wrote a letter jointly to Defendants Dr. Craane and Mrs. Reid stating, "Please send MRI report of brain + neck." He also confirmed that Plaintiff should take Zonegran at 25 mg/daily and increase the Aimovig injection from 70mg to 140mg/monthly, and to take both.

**124**. Plaintiff informed the neurologist that his headache was improving with the Aimovig injections. This could have been with more immediate remedy if not for Dr. Craane interfering, as he did from February 14 through August 15, 2022.

**125.** On August 24, 2022, Plaintiff sent another MGDPA request to Mrs. Williams for video surveillance of any visit with Dr. Craane from July 29, 2022. Plaintiff clearly informed Mrs.

Williams that it was Mrs. Reid who claimed that Plaintiff was seen that day. Mrs. Williams

directed him to the Office of Special Investigation (OSI).

**126.** On August 25, 2022, Plaintiff sent another MGDPA request to Mrs. Williams. He informed

her of her position as a responsible authority to produce data upon request. He then requested all

three videos of surveillance from April 28, July 29, and August 11, 2022. Plaintiff included that

Mrs. Williams' Post-it note brought on added confusion. Mrs. Williams responded, "Your [sic]

correct, that was confusing to receive that kite with a sticky on it. Lt. DeNuccio will be picking it

from you to address your concerns. It was a delivery error. It should not have come to you.

Thank you. Your concern is being addressed." No one ever showed up to pick up this kite.

**127.** On August 28, 2022, Plaintiff sent a kite to Mrs. Williams, letting her know that he was

under no obligation to request the same data multiple times, and that the OSI officer she directed

him to is the husband of Defendant Amber Swanson, R.N. Supervisor. Plaintiff suggested the

conflict of interest to Mrs. Williams that OSI Swanson shouldn't be authorized by law and DOC

policy to investigate his own wife's workplace. Plaintiff again requested these three videos of

surveillance. Mrs. Williams responded, "First, there is no video from 4-28-22 or 7-29-22. The

video from 8-11-2022 was saved, however, the video only shows you with a female staff, not

with Dr. Craane."

**128.** On August 31, 2022, Plaintiff sent a kite to Mrs. Reid asking if they had already sent the

neck MRI report to the neurologist. Mrs. Reid recklessly disregarded that request.

**129.** On September 05, 2022, Plaintiff sent another kite to Mrs. Williams. He informed her that

her response was inaccurate, then challenged it pursuant to Minn. Stat. § 13.04 Subd.3 & 4(a).

He again requested these 3 videos. He asked Mrs. Williams what she meant when she claimed

the video only shows Plaintiff with a female staff. He wondered if the part of the video with Dr.

Craane on 08-11-2022 had simply evaporated. On this occasion, Defendant Susan Norton

responded in place of Mrs. Williams, stating, "Video was saved of last patient room on 8/11/22

from 1:45 – 2:30 pm. The video shows a female provider and a patient. I am responding for

AWA Williams." Yet, the time Mrs. Norton noted is outside the time Plaintiff was seen by Dr.

Craane on 8-11-2022. Even the record showed the nurse who took Plaintiff's vital signs prior to

seeing Dr. Craane recorded the time at 12:55 pm. Plaintiff would have seen Dr. Craane very

shortly after the vital sign is taken.

**130.** On September 06, 2022, Plaintiff requested Zonegran per the neurologist. A nurse vaguely

replied that, "The provider states that the medication was discontinued in favor of Aimovig

injection per your request."

**131.** On September 06, 2022, Plaintiff received a letter from his neurologist, Dr. James Todd.

The postmark showed the letter was sent out on September 02, 2022. Neither Dr. Craane,

Kathryn Reid, Nikki Candor, nor any other Health Services supervisors had sent the MRI reports

of the brain and neck to Dr. Todd. The delay in Plaintiff's arrival to his appointment was

outlined by Dr. Todd. Again, Dr. Todd requested again a copy of Plaintiff's MRI report of his

brain and neck and reminded Plaintiff to take his medications, as he recommended on August 23,

2022.

**132.** On September 08, 2022, Plaintiff sent a copy of the letter from the neurologist to Defendant

Mrs. Reid. She responded that the MRI report of Plaintiff's neck  and Brain was faxed to Noran

Neuro on 08-24-2022, then said that they will resend it again that day (09/09/22).

**133.** On September 08, Plaintiff was seen by Defendant Genet Ghebre, N.P., hoping to be treated

differently with human dignity. It wouldn't be the case, as she refused to locate Plaintiff's MRI

from the medical chart in her hand, though she lazily noted on the record that, "Cervical

degenerative disc-history of MRI done. Did not see any results available at this time."

134. During the September 8th assessment, N.P. Ghebre denied Plaintiff his Zonegran prescribed

by the neurologist for migraine prevention. This was despite Plaintiff's request, and still she

claimed that Plaintiff would receive them after his hernia surgery. Yet, the Aimovig injection for

migraine prevention was administered on September 12, 2022 - two days prior to his surgery.

135. During the September 8th assessment, N.P. Ghebre was being shown the dark skin and

irritation on Plaintiff's second toe of his left foot. This was showed to Dr. Craane on August 11,

2022. The N.P. Ghebre deliberately diagnosed Plaintiff with fungus infection and prescribed

Triamcinolone Acetonide to be applied daily. To date, this dark skin remained. A CBC lab work

was also done for pre-operation.

136. The N.P. Ghebre maliciously and recklessly listed within her notes from September 08,

2022 that, "Cervical spine degenerative joint disease-appears to be patient was seen by neuro

team…we will look into further documentation for recommendation, if it is available."

137. On September 14, 2022, Defendant Surgeon Koeplin conducted a robotic hernia repair

through a laparoscopy on Plaintiff. This left Plaintiff with great pain, where he suffered severe

constipation, and couldn't get up in bed due to the pain. There was sharp pain also radiating to

his bladder and to his groin, to the point of causing excruciating pain when he urinated.  The pain

also added to Plaintiff's chronic back pain. He had to be given a suppository and other

medications to relieve the constipation. Plaintiff's bowel movements remained slow well onto

the present. Dr. Koeplin indifference and recklessness continued, he noted from his September

14th notes , deflected and blaming on the mesh from the old hernia done on September 2018 and

continued to avoid any liabilities for what went wrong and continue his disagreement with the confirmation of recurrent hernia from his prior operative site (05/05/2022).

**138.** On September 14, 2022, Plaintiff was seen by TCU doctor at MCF-Oak Park Heights (MCF-OPH) Dr. Jeffrey J. Herickoff who was aware of plaintiff's sharp pain on his Bladder and groin. Here plaintiff requested again to be provided with Zonegran per the neurologist recommendation. He related that Dr.Craane and other providers at MCF-STW refused to provide this to him. This doctor prescribed plaintiff his Zonegran, but changed the Surgeon Koeplin prescription of Oxycodone for pain in the surgical area, instead he prescribed Narco: Hydrocod/APAP 5/325 mg and yet he created an unclear record of September 15, 2022 noted that plaintiff has "History of chronic neck pain, continue Tylenol scheduled and Narco as needed."

**139.** On September 22, 2022, Plaintiff returned from the MCF-OPH TCU and had an Intake Screening by a nurse who completed the forms in pen and had Plaintiff sign them. Also, referrals were made for dental due to chronic pain and progressive holes to Plaintiff's left upper and lower jaw/teeth. This brought on such pain that he was unable to eat on that side. This stemmed from an infection of his tonsils in September 2021; and a referral to Mental Health. None of these referrals were honored accordingly. Plaintiff was also given insufficient documentation of this intake screening that included other relevant medical data and an incomplete information on Health Services grievances. In ALL, plaintiff's INTAKE screening or proper follow-up of his serious medical needs from TCU was neglected by defendants Rei, Craane, Ghebre, Amsterdam, Sneen, Larson, DeHaan, and Bosch. Specifically, his complaints of pain in his bladder and his groin and around his hernia repair site.

**140.** On November 30, 2022 Plaintiff had a follow-up for post-operation with Dr. Koeplin. During this clinical visit, plaintiff complained of continued pain around his incision's areas and bladder. He asked Dr. Koeplin for an answer to what went wrong form his first surgery and why he did not simply admit to the Ultrasound results and simply repair the recurrent hernia without laparoscopy. Dr. Koeplin stated that he did not have any answer to plaintiff' questions. Instead, he recklessly and maliciously noted on the record "Postop day 16 doing well from an Objective standpoint however the patient subjectively feels he is not going great he thinks he is having more pain than he should…" and continued to stick with his scenario of the old mesh to blame, playing games, not taking any responsibility.

**141.** On October 03, 2022, Plaintiff was once again seen by N.P. Ghebre for sick call for severe pain to his neck and chronic back pain. She found the neck MRI report from the same medical chart where she had previously claimed the results were not available. On this occasion, she claimed she could not locate the neurologist's notes from August 23, 2022. This was when Plaintiff asked about the recommendations made that day to continue with physical therapy exercises, and also requested his MRI report of his brain and neck. Plaintiff asked if (at least) his neck MRI was sent. N.P. Ghebre refused to commit to an answer, sooner noting on the record that Plaintiff, "Reports that he contacted Kathy, the Nursing Director, regarding sending the MRI results to the neurologist. We will follow-up." Yet she never tried to call the neurologist herself, as other providers would, to verify this. Rather, she continued to list throughout her notes that she strongly advised Plaintiff to keep range of motion and to work with PT, which was the recommendation made by the neurologist since August 23, 2022. Plaintiff had yet to see the physical therapist.

142. N.P. Ghebre errantly noted on the record that Plaintiff denied any recent trauma. She claimed Plaintiff told her he was assaulted in 2019, and since he has been having headaches, neck pain and lower back pain. She noted that Plaintiff adds that headaches actually are chronic "since childhood". This, despite Plaintiff reports to her of three well-documented incidents of November 06, 2019, January 10, 2020 and February 22, 2020, when he lost consciousness and fell and hit his head and neck. Despite no such documenting of Plaintiff complaints of chronic headaches prior to May 2019 assaults, nor complaints of neck and lower back pain from May 2019 through November 06, 2019.

143. Contrary to the false and made up assertions made by N.P. Ghebre, Plaintiff sent a JPay email to his sister in London to ask if she could recall any event in which Plaintiff suffered from chronic headaches in his childhood. She responded, "HELLO My darling brother, as I know, regarding your childhood, you never suffered from chronic headaches. You were fine and healthy." Plaintiff also had his sister contact the Noran Neuro Clinic to know if they've acrually received the neck and brain MRI report. She contacted them via conference call, Neuron nurse couldn't find any record of the MRI, she told plaintiff she will have the neurologist contact his sister. Unfortunately, plaintiff's sister phone number has now been blocked from the DOC phone services. Plaintiff made two more calls to his sister on October 23, 2022 and November 01, 2022, there was a pre-recorded voice in a form of a PRANK repeating itself. Specifically, the call from November 01, 2022 did go for the entire 15 minutes. Plaintiff requested these calls to be preserve, defendant Moe directed him to OSI.

144. N.P. Ghebre ordered a plain x-ray for Plaintiff's chronic lower back pain which is associated with numbness, muscle stiffness and spams and pinched nerves. She vaguely noted that she "reviewed laboratory data" with Plaintiff. In reality, she did not. The CBC test results

done on September 08, 2022 showed a continuation of Neutropenia with low white blood cell
and low neutrophils counts. This was not documented.

145. N.P. Ghebre negligently, recklessly and purposely diagnosed Plaintiff with "neck and lower
back pain-chronic, no acute trauma reported. Degenerative joint disease versus musculoskeletal
including inactivity." This was despite reports by Plaintiff stating that he was doing exercises on
his own as well as their refusal to follow the neurologist recommendations for PT exercises. No
order for PT was made. Still, the diagnosis of Plaintiff being a symptomatic argumentative
continued. Plaintiff's complaint of compression done to his degenerative disc by PT DeHaan, the
aggravating symptoms continued chronic back pain and pain on his left upper and lower jaw to
be neglected, and medical care withheld from him by Defendants Craane, Bauder, DeHaan, Reid,
Ghebre, Tina Sneen, Lu, Louis Shecker, Larson, James Amsterdam, Schnell, and Bosch.

146. On October 11, 2022, Plaintiff was once again seen by N.P. Ghebre. She continues to
diagnose plaintiff with aphasia chronic in nature to infer that plaintiff has difficulty explaining
his symptoms. Plaintiff was told his plain x-ray was normal, despite the severe pain, numbness,
spasms, stiffness and pinched nerves. Mrs. Ghebre diagnosed Plaintiff with "Lumbar Sacral back
pain-chronic. Nontraumatic." Once again, she was recommending physical therapy for
strengthening exercises. It was unclear if Plaintiff would be seen for his neck issue.The record
revealed that N.P. Ghebre made a referral to physical therapy Mr. DeHaan for "Lumbar Sacral x-
ray negative for any fracture oor dislocation. Stable skeletal. Please work with patient for
strength exercise to help with nontraumatic pain."

147. During the October 11, 2022 visit, Plaintiff asked N.P. Ghebre if she knew of the
neurologist actually receiving the copy of his neck MRI, and what the neurologist recommended

43

as treatment. Mrs. Ghebre said she didn't know, but she offered that the neurologist is not an appropriate specialist to address cervical disc degeneration.

**148.** On October 16, 2022 plaintiff sent a sick call to dental for referral made since September 16, 2022 and September 22, 2022. This was due to progressive severe pain on his left upper and lower jaw and holes in his teeth and unable to eat on that side. And due to over use of his right side, he began to develop pain on that side also. No one saw plaintiff.

**149.** On October 19, 2022, Plaintiff was seen by defendant Cheryl Cole, RN for sick call for severe and constant pain and cramps on his 3rd and 4th fingers of his right hand, with associated joint pain. This pain radiated from his neck to shoulders, wrist and fingers. Yet, this condition started on the 4th finger, which was reported to Dr. Craane but he neglected to take any further action. This sick call was also for sharp pain and stiffness in his neck that had been getting gradually worse, radiating down between C7 to his thoracic spine area, numbness on both shoulders and arms, back pain and severe pain in his sinuses with cuts in his left nostril. In helping their blended treatment deprivation system, RN Cole di not conducted any physical exam on plaintiff's neck or back, nor cuts in his nostril, yet she recorded that "He has AROM of all fingers with good CMS." She also falsely noted that when she asked plaintiff about back exercises, plaintiff said he isn't doing any.

**150.** Plaintiff was provided the record of his intake from September 22, 2022 in electronic form, there were missing a lot of relevant medical information. He made a request pursuant to MGDPA and Minn. Stat. § 144.215 to Mrs. Reid, asking for the original intake notes the attending nurse completed in pen and had Plaintiff sign. Mrs. Reid responded that "they don't exist." On October 12, 2022, Plaintiff requested them yet again. Mrs. Reid replied that these notes are not maintained. On October 16, 2022, another request was made, where he asked Mrs. Reid why

these notes are not maintained. She refused to comply with these statutes, changing her story, stating, "All documentation is maintained in the medical record."

151. On October 16, 2022, Plaintiff made a request pursuant to MGDPA and Minn. Stat. § 144.215 to Mrs. Reid requesting copies of ALL of his sick call slips/requests he'd submitted for the last 90 days. Mrs. Reid responded that sick call slips are not maintained.

152. The OLA's 2014 Health Services in State Correctional Facilities, contrary to Mrs. Reid's stance, mentioned the first recommendation that states that DOC should adopt a policy that requires DOC to maintain documentation of sick call requests for a least 90 days. The DOC policy 500.045 "Offender Sick Call" internal controls, states, "Sick call logs are retained by that registered nurse supervisor for 90 days."

153. On October 26, 2022 plaintiff signed up again for dental, he was seen until October 31, 2022. First, the nurse told him that it took this long because this was a routine request and they did not have dentist, this despite two dentist one that has been recently hired. After the x-ray were completed the Dentist (Dr. Lawhead) jumping into a conclusion stating that plaintiff wasn't flossing his teeth. Plaintiff told him to stop jumping to any a conclusion before examining him and gathering medical history. Then, Dr. Lawhead told plaintiff that one of his bottom teeth was dead and need to be removed and another one needed a filling. Hearing this, plaintiff reported his medical history of tonsillitis and he was also experiencing severe neck pain and stiffness on his right side with burning pain and numbness on his shoulders and chest pain. This doctor told plaintiff he will talk to Dr. Craane regarding the possibility to remove the tonsils.

154. It was here that during the dental sick call that plaintiff had an opportunity to go over his dental records. He found out that through his entire incarceration he only had two dental assessment. The first one was in January 06, 2016 and the second was on May 27, 2020. This

was contrary to the "Care Conference Summary Report" of June 01, 2022 stating that plaintiff

had "3 dental in 2020." Also, plaintiff discovered that same TCU Nurse who recorded from the

electronic medical record that plaintiff's lower teeth look quite compromise, she also recorded on

the paper chart in pen that, "Teeth looked very compromised... Dr. Lawhead will need to OK

treatment."

**155.** On October 27, 2022 Plaintiff was seen by N.P. Ghebre also did not conducted physical

exam on plaintiff's fingers for pain and cramps, nor did she examined his sinuses or neck,

instead she jumped into a conclusion stating that plaintiff is experiencing seasonal sinuses

allergies, then prescribed Claritin despite plaintiff's ongoing sinuses issues and MRI results

showing sinus mucosal thickening. N.P. Ghebre also prescribed Indomethacin 25 mg for

condition on plaintiff's fingers, but plaintiff has yet seen the physical therapy as N.P. Ghebre

continuously saying he will and that placed a referral but unclear if she actually made an

ORDER for Physical therapy.

**156.** On October 30, 2022 plaintiff signed up for sick call for constant pain in the lining of his

stomach all the way to his right upper and left quadrants and sharp pain in his bladder that goes

down to is groin and when he urinates that has been there since the laparoscopic hernia surgery.

This pain was reported to a TCU nurse on September 19, 2022. On November 01, 2022 plaintiff

was once again seen by defendant R.N. Cheryl Cole. She once again sat in the chair without

conducting any physical examination on plaintiff. Plaintiff also complained of pain on his

Sternum that affect also muscles around that entire area bilaterally all the way up to his right side

of the chest and muscle aches.

**157.** On November 04, 2022 plaintiff was once again seen by N.P. Ghebre to address his sick

call of stomach issues post-operatively. At this visit, N.P. Ghebre tried her best to convince

46

plaintiff that he has aphasia then attempting to describe his symptoms for him, then concluded

that plaintiff has Acid-reflux then she was prescribing medication for Acid-reflux stated that

plaintiff should take them for 60 days then she will re-evaluate him again at that time. Plaintiff

raised concern regarding N.P. Ghebre's indifferent to his serious medical needs, he told her that

he was not having any Acid-reflux the kind of pain he is reporting is somewhat the same as he

reported around June 2022 that turned turn out to be a recurrent hernia. There was a tense

argument with NP Ghebre due to her attempt to convince plaintiff that his condition was Acid-

reflux. Plaintiff also reported having nausea, N.P. Ghebre would her head in grimacing

expression and aske plaintiff, "So you said you have nausea but not Acid-reflux." Plaintiff told

Mrs. Ghebre that he also suffers of migraine which cause nausea, N.P. Ghebre said nothingmore

then left the room.

**FIRST CAUSE OF ACTION – Defamation of Character Libel and Intentional infliction of emotional distress**. Minnesota Assistant Attorney General Mr. Kevin Jonassen, Commissioner of Corrections Mr. Paul Schnell, Deputy Commissioner Michelle L. Smith, Warden Guy Bosch, Victor Wanchena Ass. Warden of Admin.; James Amsterdam, M.D.; Kathryn Reid, RN; Lynn Noll, RN; Tammy Lisowy, therapist; Monica Arons, RN; Sara Hard, RN; Lori Lewis, RN; Rick Raven, Mail Room Lt.; and Leigh McCoy, Mail Room staff.

**158**. Plaintiff re-alleges paragraphs 1-27, as if fully recited, for this cause of action and incorporates all of the facts stated in those paragraphs into this cause of action.

**159**. The above Defendants deliberately caused irreparable injury to Plaintiff's personality, character, and reputation by claiming that Plaintiff had UNCLEAN HANDS, publishing it on the public record, from November 16, 2020 and February 12, 2021, to the present - despite lacking evidence to support these defamatory allegations.

**160**. The above Defendants were reckless in the treatment of Plaintiff by way of using such a defamatory labeling of Plaintiff, and by way or example but not limitation, the following: (a) failure to properly assess the defamatory labeling on Plaintiff; (b) take proper steps to seek removal of the defamatory language from the Court record, where they have pressed even more

that they will reassert the defamatory labeling again, during or after trial; (c) in other manners negligent without human decency, lacking feeling on how it will impact Plaintiff's mental and emotional health, as well as his reputation and character being damaged by using such a defamatory labeling, spreading lies publicly in that Plaintiff has unclean hands.

**SECOND CAUSE OF ACTION – Retaliation & First Amendment** ALL named Defendants herein except for Surgeon Michael Koeplin.

**161.** Plaintiff re-alleges paragraphs 1-157 as if fully recited for this cause of action and incorporates all of the facts stated in these paragraphs into this cause of action.

**162.** The refusal of Defendants to provide to Plaintiff's specialists copies of his neck and brain MRI after multiple requests by these specialists, interfering with his prescribed treatment, surgical procedures and proper pre-operation follow-ups. This includes the refusal to provide Plaintiff with treatment that his cervical disc degenerative disease requires. As a result of Plaintiff having filed lawsuits against prison staff, it brought on retaliation for petitioning government for redress of these grievances and therefore violated the First Amendment. Also, seeking the treatment of these cervical disc symptoms is not unreasonable, and would have alleviated the pain to Plaintiff's neck, back, shoulder, wrist, and fingers. For this very purpose, among other things, these are the items he needs to continue in his litigations.

**163.** The refusal to preserve video surveillance that could provide concrete evidence to prove how Defendants had, indeed, violated Plaintiff's potential protected under Federal Constitutional rights, and his allegations of retaliation bring this cause of action. The serving purpose on each cause of action includes the request of video footage showing a physical therapist going behind Plaintiff, using excessive force of compression on his degenerative cervical disc with direct knowledge of this condition.

**164.** Defendants intentionally and maliciously refused to contact Plaintiff's native country of the Republic Democratic of Congo. This was to for the purpose to inform them of Plaintiff's confinement and his serious injuries. In turn, Defendants falsely claimed that they did, yet refused to produce proof of fax confirmations. DOC policy requires that the case worker "must file a copy of fax confirmation in the offender electronic file." Defendants have clearly violated Plaintiff's Frist Amendment encroachment of his first Amendment freedom, played with his Embassy, crossing international border lines, errantly and absently violating the Vienna Convention by way of this retaliation.

**THIRD CAUSE OF ACTION – Cruel and Unusual Punishment,** Commissioner Paul Schnell, Warden Guy Bosch, Victor Wanchena, Ass. Warden of Admin.; Stephen Craane, M.D.;

Luke DeHaan, PT; Nanette M. Larson, Dir. Of Health Services Unit; Louis Shicker, M.D.; Carol LU, M.D.; Jay Bauder, M.D.; Genet Ghebre, N.P.; James Amsterdam, M.D.; Tina Sneen, Dir. Of Nursing; Kathryn Reid, RN; Amber Swanson, RN; John DeMay, RN; Sara Hard, RN; Niki Candor, RN; Cheryl Cole, RN; Surgeon Michael Koeplin; Susan Norton, Steve Renstrom; and Dan Moe.

**165**. Plaintiff re-alleges paragraphs 1-157 as if fully recited for this cause of action and incorporates all of the above facts stated in these paragraphs into this cause of action.

**166**. All the above Defendants jointly committed acts of wanton negligence, recklessness, maliciousness, and a complete disregard for the rights and safety of Plaintiff. Each inflicted cruel and unusual punishment, in violation of Plaintiff's Eighth and Fourteenth Amendments rights under the Federal Constitution and Article 1, Section 5 of the Minnesota Constitution. Plaintiff needed help. He asked for help. He sought care from the person in control. In return, Defendants named herein deprived and withheld the neck and brain MRI from the specialists within the full scope to address Plaintiff's cervical disc degenerative disease, chronic sinuses, and associative chronic back pain. This deprived him of the adequate care his degenerative disc disease requires, and prevented any recommendation for proper treatment to be made for his serious medical needs. In addition, it interfered and deprived him of his Aimovig injections for no less than six months, which had initially been prescribed as his primary treatment for his migraine prevention, posttraumatic headaches, and occipital Neuralgia and cervicogenic headaches. This was followed by having his injured neck compressed by a physical therapist. On given information and belief, this was never done to any other inmates; yet with the aiding and abetting of all other Defendants, in an effort to suppress and deliberately refuse to preserve video surveillance of this incident. Plaintiff was humiliated rather than properly availed the medical treatment, care and attention that he deserves as a human being with civil rights.

**167**. Defendants repeatedly denied and delayed sick calls to Plaintiff and in turn deliberately manipulated notes to pretend that a sick call actually took place on July 29, 2022. Then, interfered with his medication of Zonegran prescribed him by a neurologist on August 23, 2022.

**168**. Plaintiff suffered a recurrent hernia less than a month at the site of the previous operation done by Defendant Surgeon Koeplin. Rather than taking full responsibility, surgeon Koeplin underestimated the ultrasound results, showing a confirmation of recurrent hernia and then requested a more painful procedure of laparoscopy for a "possible hernia." After the surgery, he contributed the cause to "the old mesh" near the lining of the stomach, which was placed there from a previous procedure in September 2018. He claimed that the mesh was causing more hernia to recur. However, this was never his assessment when he first did a previous surgery as that mesh was still intact. As a result, Plaintiff suffered severe constipation, bloating stomach, severe pain to his bladder and throughout his groin. This radiated through well onto his back, and slowed his bowel movements.

**169.** The violation of Plaintiff's rights is a direct system of blended service delivery between Centurion and the DOC, and the mishandling of medical records, including a breach of contract, No. 137626 and non-effective and unrevised policies governing Inmates medical record.

**170**. A doctor's refusal to document an entire clinical visit of Plaintiff's serious medical needs is a serious danger to Plaintiff's health and safety. Plaintiff now developed constant pain and cramps throughout his right hand, radiating down to his wrist and 3rd and 4th fingers of his right hand which he first reported at the doctor's visit, from April 28, 2022; but the doctor refused to produce notes of that visit. Plaintiff's condition of cramps on these fingers were again discussed on October 19, and October 27, 2022.

**171**. Conduct of Defendants amounted to a deliberate indifference to Plaintiff's serious medical needs, this included plaintiff's teeth had to be removed because of defendants reckless disregard to his complaints.

**172**. Plaintiff gave notice to Defendants that if his neck MRI report is once again withheld from outside specialists he would file a § 1983. Soon following, Defendants held an impromptu malicious meeting with Plaintiff. This included Defendant Tina Sneen from the DOC Central Office. Defendants first labeled it "Bakambia Care Conference", though on the summary report of that conference they stated that, "Patient concern C3-c4 images not sent to Neurologist. Provider response, He spoke to the Specialist they had no additional concern and requested no further imaging/documentation." This is contrary to Neurologist Dr. Todd, who requested Plaintiff's neck and brain MRI report several times, including by sending directly a letter to Plaintiff because Defendants would not send it. Yet defendants fabricated that they had faxed it, even though there was no fax confirmation. They had also fabricated data on the summary report, such as the number of times Plaintiff had dental visits in 2022, provider encounters in 2020, 2021 and 2022, and occasions Plaintiff had appointments with nurses, from January 2022 to June 2022.

**173.** During the "Care Conference", Plaintiff asked Dr. Craane to provide him with the guidelines he follows regarding diagnosis and treatment of chronic back pain, and C3-4 disc degenerative disease. Defendant Sneen, RN, and Reid, RN prevented Dr. Craane from responding, soon answering on his behalf, in what they called a "team response." They noted on the "care conference" notes that "provider and other group members explained there were no specific guidelines. Due to the complexity of the practice of medicine, providers are not restricted to static sets of treatment." This is contrary to their own contract, No. 137626 "The contractor shall design and implement a process for specialty referrals acceptable to DOC. The process must include the use of commonly used practice protocols and guidelines. The CONTRACTOR must provide electronic copies of the protocols to the DOC prior to contract execution. The CONTRACTOR shall provide Specialty Services when medically indicated and supported by practice guidelines. The provider must provide ALL SPECIALTY SERVICES WHICH COULD BE NEEDED, BASED ON BOTH correctional and community standards of care.

**174.** As a result of the cruel and unusual punishment inflicted by the above named Defendants, Plaintiff has suffered serious medical needs prison officials knew of, but deliberately disregarded, including: permanent disability, irreparable damages, pain, suffering, humiliation, embarrassment, and intentional infliction of emotional distress which constitute cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments of the United States Constitution, and Article 1, Section 5 of the Minnesota Constitution. Plaintiff endured a

progressive painful degenerative cervical disc disease that was later exacerbated by a named Defendant in the compressing of his neck with direct knowledge of his injuries, yet refused to check on the extent of the injuries caused by the compression, refused to diagnose or refer him to an appropriate specialist to treat his degenerative disc. Plaintiff will continue to suffer pain and more deterioration of his cervical spine and elsewhere on his body, as he is already suffering from severe and chronic back pain, numbness on both arms, pinched nerves, pain and cramps on his 3rd and 4th fingers of his right hand and wrist.

**FOURTH CAUSE OF ACTION – Excessive Force, Assault and Aiding and Abetting.** Physical Therapist Mr. Luke DeHaan; Dr. Craane; Commissioner Paul P. Schnell; Warden Guy Bosch; Victor Wanchena, Ass. Warden of Admin.; Nanette M. Larson, Dir. Of Health Services Unit; Tina Sneen, Ass. Dir. Of Nursing; Kathryn Reid, RN; John DeMay, RN; Amber Swanson, RN; Steve Renstrom, caseworker, and Dan Moe, Program Director/Ass. Warden of Admin.

**175.** Plaintiff re-alleges paragraphs 1-157 as if fully recited for this cause of action.

**176.** Defendant DeHaan used excessive force upon Plaintiff's neck with direct knowledge of his cervical disc degeneration. This use of force was not done to restore Plaintiff's injuries; this was done intentionally, maliciously and sadistically to cause harm. It was nothing short of an assault on Plaintiff, which violated the contemporary standard of human decency, whether or not significant injury was evident. It is medically settled that a compression on any part of the spine, especially one that is already degenerating, may cause further injuries to any part of the person's body and spine itself, immediately or within days, weeks, months, or slowly to years. As a result of this compression, Plaintiff's degenerative cervical disc symptoms exacerbated with severe pain, pinched nerves, poor sleep, and constant flare ups of these symptoms, causing him not to be able to focus or concentrate he developed arthritis to his right hand, wrist and 3rd and 4th figngers. The pain was felt directly between his degenerative discs a few days following the compression. Mr. DeHaan's use of excessive force was repugnant and this was strictly an assault on Plaintiff with no penological justification.

**177.** Defendant Dr. Craane and others jointly aided and abetted this criminal conduct, tampering with video surveillance evidence showing Mr. DeHaan going behind Plaintiff, placing both his hands to Plaintiff's head, and without warning compressed his neck. This action may cause a spoliation of video surveillance. Plaintiff asked for an additional MRI of his neck to see the extent of injuries suffered from the compression during the care conference held on June 1st, 2022, Defendants refused to allow this, claiming that it was not medically indicated, but it is unclear if the compression was medically indicated. Defendants also prejudiced Plaintiff in their care conference. First, they later labeled this conference as a "multidisciplinary conference". Still, no family member or person to advocate for Plaintiff was present at the conference. Defendants used this so-called multidisciplinary conference in their favor as a criminal tactic to further suppress Plaintiff's issues. They then refused to name themselves in the "summary report" of that meeting.

**FIFTH CAUSE OF ACTION – ADA.** Dr. Craane; Commissioner; Warden; Dr. Bauder; Dr. LU; NP. Ghebre; Dr. Shicker; Wanchena; Williams; Nanette M. Larson; Sneen; Reid; Swanson; DeMay; Amsterdam; Renstrom; Moe; Hard; Cando, Cheryl Cole and Norton.

**178.** Plaintiff re-alleges paragraphs 1-157 as if fully recited for this cause of action.

**179.** All above-named Defendants in this cause of action were jointly indifferent to Plaintiff's serious medical needs, interfered with proper medical care, and further deprived him of the care his disability of cervical disc degenerative disease requires. Defendants demonstrated blatant discrimination in violation of the Americans with Disabilities Act 42 USCS §§ 12101 – 12213, while Defendants were acting in their official and individual capacities. As a result, Plaintiff's disabilities remained untreated, neglected, and symptoms exacerbated. Refusal to provide the neck and brain MRI report to Plaintiff's neurologist even after multiple requests of these reports by the neurologist in order for him to address Plaintiff's disability. This included a letter sent to Plaintiff directly from his neurologist, which undoubtedly amounted to criminal recklessness and discrimination to an ADA person and deliberate indifference.

**SIXTH CAUSE OF ACTION – Negligent Hiring, Contracting and Retention, and appointment.** Mr. Governor; Commissioner; Warden; Nanette M. Larson, Dir. Of Health Services Unit; and Centurion Management.

**180.** Plaintiff re-alleges paragraphs 1-157 as if recited for this cause of action.

**181.** Defendants Commissioner, Warden, Larson and Centurion failed to hire and contract competent medical doctors and adequate medical staff, as required by Hines v. Anderson, 439 F. Supp.12 (D. Minn. 1977). Defendants sooner retained incompetent medical doctors despite knowledge of the doctor's incompetence and negligent conduct, as clearly shown under *Stanley Dwayne RILEY V. State of Minn… 2011 WL 9686214 Case No.: 82-cv-10-1377.*

**182.** As a result of Defendants Commissioner, Warden, Larson, and Centurion failure to hire competent medical doctors and adequate medical staff, and above-named Defendants' affirmative action and retaining incompetent medical personnel, Plaintiff's cervical disc and headaches symptoms were not diagnosed until it reached a dire degenerative stage.

**SEVENTH CAUSE OF ACTION - Minnesota Data Practice Act.** Commissioner, Warden; Victor Wanchena, Ass. Warden of Admin.; Marisa Williams, Ass. Warden of Admin.; Susan Norton, Facility Paralegal; and Kathryn Reid, MCF-STW Dir. Of Health Services.

**183**. Plaintiff re-alleges paragraphs 1-157 as if fully recited for this cause of action.

**184.** Defendant Governor Tim Waltz failed to appoint, hire, and retain competent Commissioner of Correction and Ombudspersons for Corrections. Appointing and keeping the Ombudspersons under his Executive Branch to investigate complaiints against DOC which is also under control of another appointed person by the Govrnor, this clearly creat a conflict of interest toward Inmates. As a result of defendant Governor failure to appoint a competent Commissioner and failure to keep Ombudsperson under the Legislative Branch, many complaints of inmates and plaintiff's complaint were not addressed and allowed the federal constitutional right of inmate continue to be recklessly violated by the prison officials

**185**. Defendants Commissioner, Warden, Wanchena, Williams, Norton and Reid willfully violated the provisions of this chapter, refused to comply or produce data requests to Plaintiff, such as video surveillance and other substantial documents. These Defendants went above and beyond by lying that these videos did not exist, and refused to disclose its content to Plaintiff after he requested to view them pursuant to Minn. Stat. § 13.04 Subd.3 & 4(a).

**186**. Defendant Wanchena outright lied that there was no video surveillance of Plaintiff's physical therapy section that will show Defendant DeHaan going behind Plaintiff and compressing his injured Cervical Disc Degeneration. Mr. Wanchena again lied without fear of the consequences for violating this chapter, as he claimed that there was no camera inside Examination Room 10 119 (the last patient room) where Plaintiff was seen by Defendant Dr. Craane on April 13, 2022. This would otherwise not show the 30 minutes time spent counseling Plaintiff, as Dr. Craane claimed on the record. Nor would it prove that any physical exam was conducted that day, yet he also fabricated data claiming that he did. The Commissioner 's Office also backed up these lies, stating that there was no camera in that exam room, and that if there was a need to record a security officer would be present with a video camera.

**187**. Defendant Marisa Williams repeatedly played with Plaintiff in his attempts to preserve video surveillance footage pursuant to MGDPA. She then lied, claiming that some other videos don't exist and the video from the August 11, 2022 clinical visit with Dr. Craane was saved but this video had only shown Plaintiff with a female staff, not with Dr. Craane. Yet, Dr. Craane did write notes from this visit. Defendant Susan Norton later changed the story, claiming that this video shows the last patient room, a patient and a female provider. This room is the same room Defendant Wanchena and the Commissioner lied that there was no camera in that room. Also, it is unclear, making no sense to the fact that Defendants claimed they saved a video clearly of a different patient/inmate while Plaintiff requested video pertaining to his clinical visit. The time Plaintiff was seen by Dr. Craane was between 12:55 to 1:30 PM. Defendant Norton stated that they saved video from 1:45 – 2:30 PM.

**188.** Defendant Kathryn Reid claimed that she faxed a copy of Plaintiff's neck and brain MRI report to his neurologist. Plaintiff then requested the fax confirmation pursuant to MGDPA. Mrs. Reid stated that there is no such confirmation. Further, Plaintiff asked for his intake notes that the attending nurse completed on 09/22/2022. She had Plaintiff sign them and all of his Sick Call/Requests for the past 90 days. Mrs. Reid claimed that these are notes not maintained.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff request that this Court Grant the following relief:

 **A.** Declare that Defendants have violated Plaintiff's Constitutional Rights not to be subjected to Defamation and Libel, not to be retaliated against for filing lawsuits, not to be subjected to cruel and unusual punishment and discriminated under ADA. Declare that Defendants have violated Plaintiff's rights under First, Eighth, and Fourteenth Amendments to the U.S. Constitution, ADA, and MGDPA.

**B.** Issue an Injunction requiring Defendants, prison medical provider, and medical staff, including the Governor, the Commissioner and the Warden to do so immediately without any further delay:
(1) refer Plaintiff to an orthopedist who can address his Cervical Disc Degenerative Disease;
(2) provide the assigned neurologist with Plaintiff's neck and brain MRI as the specialist and neurologist have requested. They should also send the copy of the MRI of neck to Plaintiff's otolaryngologist with a confirmation.
(3) arrange for Plaintiff's follow-up with an otolaryngologist (ENT), as it had been requested as a follow-up in 6 months;
(4) install video surveillance inside each examination room at MCF-Stillwater Health Services that do not have cameras within them; room numbers: 10 113, 10 114, 10 115 & 10117, and directly inside the physical therapy room. This room should not rely on cameras around it;
(5) to cease and desist from any further retaliation against Plaintiff for seeking redress of grievances in Court;
(6) for Defendants to immediately provide proper dental care to Plaintiff;
(7) for Defendants to show cause as to why they held such a "care conference" on June 1st, 2022 with Plaintiff, and justify why they later labeled it "Multidisciplinary Conference." Why this committee did not consist of qualified medical personnel required to attend a multidisciplinary committee improvement conference. Why Plaintiff was denied having any advocate or his family

member present at this conference; what role Plaintiff's case worker and his supervisor played in that conference; Defendants should produce reports of each individual staff member who participated in this conference and an amended summary report which contained names and titles of all staff members that participated in the care conference in one document. It should reflect what staff member wrote the summary report, including date and time it was written,

(8) to provide the fax confirmation of fax sent to Plaintiff's embassy and of MRI report of Plaintiff's neck and brain faxed to the neurologist, as Defendants claimed;

(9) to contact Plaintiff's embassy and inform them of Plaintiff's serious injuries and illnesses and his confinement; whatever means they chose to do this, the confirmation shall be filed in Plaintiff's electronic file;

(10) to cease and desist from any further interference with Plaintiff's medical care and treatments;

(11) to cease and desist from any noncompliance with MGDPA requests, Defendants should show cause why they did not comply with all data request made by Plaintiff pursuant to MGDPA.

(12) to order that all Peer Review Committee data become public record, as was suggested by the Legislative Auditor Report done on Health Services in 2014.

**C.** Award Compensatory damages:

(1) Ordering Defendants Schnell, Jonassen, Bosch, Smith, Wanchena, Amsterdam, Reid, Noll, Arons, Hard, Lewis, Raven, McCoy, Lisowy to pay Plaintiff 250 dollars in actual damages per day from November 16, 2020 to present. This is the date they had published these defamatory remarks against Plaintiff and they should continue to pay him 250 dollars per day, until the day it is decided to seek proper removal of these defamatory labeling from the court record. They should pay Plaintiff 1,000,000 dollars in punitive damages for intentional infliction of emotional distress.

(2) Ordering Surgeon Koeplin to pay Plaintiff 350,000 dollars in actual damages for physical damages, pain and suffering, and wanton infliction of physical pain through second surgery by laparoscopy and pain suffered after this procedure and 350,000 dollars for punitive and intentional infliction of mental anguish and distress.

(3) Ordering defendants Craane, DeHaan, Tim Walz, Schnell, Smith, Bosch, Wanchena, Williams, Larson, Sneen, Lu, Shicker, Bauder, Ghebre, Larson, Zadra, Dobratz, Asmterdam, Reid, Swanson, DeMay, Candor, Norton, Renstrom, and Moe jointly to pay plaintiff 750,000 dollars in actual damages, pain and suffering and 750,000 dollars for punitive and intentional infliction of mental enguish and emotional distress.

(4) Ordering defendants Luke DeHaan, Craane, Schnell, Larson, Sneen, Bosch, Wanchena, Reid, Swanson, DeMay, Renstrom and Moe to pay plaintiff 250,000 dollars for use of excessive force damages and aiding and abetting; and 250,000 dollars for intentional infliction of emotional distress and punitive damages.

(5) Ordering defendants Wanchena, Williams, Reid and Schnell to: a) pay plaintiff pursuant to Minn. Stat. § 13.08 Subd.2 a sum of 5,000 dollars for each data that their willful failure or opposed to produse and in case defendants caused a Spoliation of these video surveillances and other Substantial documents this Court should impose Sanction favoring plaintiff and the spoliation should be used against them on a Jury instructions; b) This Court should issue an Injunction and a criminal penalties pursuant to Minn. Sta. §§ 13.09 & 13.08 Subd.2.

**D.** Ordering defendants to pay all cost incurred in prosecution of this Lawsuit including cost, disbursement, attorney fees and any other relief as it may appear Plaintiff is entitled to.

**E.** Granting such further relief as this Court deems just and proper.

Subscribed to before me

This _____ 4 _____ DAY OF November,2022     Signature of Plaintiff _____

Mailing Address: Marc Amouri Bakambia
O.I.D. # 248643
MCF-Stillwater
970 Pickett Street North
Bayport, MN 55003

ERIC L HENNEN
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2025

Telephone Number: 651-779-2747
(Plaintiff's Caseworker's office number)

56